# IN THE SUPREME COURT OF CALIFORNIA

THE PEOPLE,
Plaintiff and Respondent,
v.
EDUARDO DAVID VARGAS,
Defendant and Appellant.

S101247

Orange County Superior Court
99CF0831

July 13, 2020

Justice Cuéllar authored the opinion of the Court, in which Chief Justice Cantil-Sakauye and Justices Chin, Corrigan, Liu, Kruger, and Groban concurred.

PEOPLE v. VARGAS

S101247


Opinion of the Court by Cuéllar, J.


Defendant Eduardo David Vargas was convicted of one count of first degree murder (Pen. Code,[1] § 187, subd. (a)), six counts of robbery (§§ 211, 212.5, subd. (c)), one count of attempted robbery (§§ 664, 211), two counts of active participation in a criminal street gang (§ 186.22, subd. (a), defined at the time of the offense as "street terrorism"), and one count of possessing a firearm while on probation (former § 12021, subd. (d)). The jury also found true a robbery-murder special-circumstance allegation. (§ 190.2, subd. (a)(17)(A).) The People alleged as well, and the jury found true, allegations that defendant personally discharged a firearm causing death during the robbery murder (§ 12022.53, subd. (d)), and that the crimes were committed with the intent to promote a criminal street gang (§§ 186.22, subd. (b), 12022.53, subds. (b), (e)(1)). After a penalty trial, the jury returned a verdict of death. The trial court denied the automatic application to modify the verdict (§ 190.4, subd. (e)) and, on October 4, 2001, sentenced defendant to death. This appeal is automatic. (§ 1239, subd. (b).) We affirm the judgment.

---

[1] All further unspecified statutory references are to the Penal Code.

## I. FACTUAL BACKGROUND

### A. Guilt Phase

#### 1. Prosecution Case

##### a. March 30, 1999

###### i. Baek and Kim

Realtor John Baek met with contractor Hong Kim on March 30, 1999 to inspect an abandoned property in Santa Ana. While Baek and Kim spoke, two men entered the property. One of the men, whom Baek later identified as defendant, pointed a gun at Baek and ordered him to give the men everything he had. Baek gave the men his pager and wallet, which contained cash and credit cards.[2] Kim raised his hands in the air after seeing the two men enter with a gun, and his cell phone and checkbook were taken from him. After the two men left, Baek called the police using the cell phone in his car.

Perly Abdulnour, owner of WorldNet Pager, testified that on the afternoon of March 30, 1999, three men came into his store. One of them, Eloy Gonzalez, with whom Abdulnour was familiar, wanted to pay his bill. The other two men wished to purchase pagers. Abdulnour accepted a $27.00 credit card payment on Gonzalez's account for "air time." The other two men, Matthew Miller,[3] and a man who identified himself on the

---

[2]     Baek later learned two unauthorized purchases were made using his credit cards, both at WorldNet Pager, in the amounts of $27.00 and $329.99.

[3]     Abdulnour testified that he did not know Miller's name at the time the pager was purchased, but he learned it while testifying at a different trial three months before defendant's trial.

pager application as "Carlos Juan Rodriguez," each purchased a pager. The pagers were collectively worth approximately $240.00.

Baek described the gunman to police as a black-haired male with a "light complexion," about five feet 10 inches tall, weighing 150 pounds. Baek described the individual who was not wielding the gun as a black-haired Caucasian male weighing approximately 180 pounds, with a height of five feet nine inches. On April 8, 1999, Baek was shown a photo lineup, and he identified defendant as the gunman. Baek also identified two photographs, including one of Matthew Miller, as possible images of the nongunman involved in the robbery. Baek attended a live lineup at the Orange County Jail, where he again identified defendant as the gunman. On April 12, 1999, Abdulnour identified the three men through a photo lineup as defendant, Gonzalez, and Miller, and he identified defendant at trial.

### ii. Hill and Wilson

Shortly before midnight on March 30, 1999, Leavon Hill and his stepson Cornelius Wilson were working on Hill's truck in front of his home in Santa Ana. Three men walked up to Hill, whose back was to the street, and Wilson — who was getting jumper cables from the trunk. By the time Hill noticed the three men, they were directly in front of his truck. As Hill commented that it was a strange time of night to be out walking, "one of the gentlemen pulled [a] gun on" Hill. Hill described the gun as "all black." The man holding the gun then "left [Hill] and he went after [Hill's] son," and one of the two other men who had walked up to Hill and Wilson told Hill, " 'if you move, I am going to shoot you.' "

Hill had been slowly walking backwards toward his home and, despite the warnings that he would be shot if he moved, decided to run into his home anyway to call the police. After Hill ran into his home, Wilson ran away down the street. At some point during the altercation, the first man, who had been holding the black gun, stole Hill's wallet. One of the men, the one who had told Hill he would be shot if he tried to move, attempted to take the stereo from Hill's truck but was unable to complete the task before all three men left the area; the stereo was found on the seat of the truck, although it had been installed prior to Hill and Wilson's altercation with the three men.

Hill described the gunman as about five foot nine or ten, and 165 or 170 pounds. Hill identified defendant as the gunman at a photo lineup on April 13, 1999, and also identified the gunman as defendant at trial. Hill described the man who removed the stereo and told Hill he would be shot if he tried to move as the tallest of the three men, standing at about six feet. Hill was unable to identify anyone else at the photo lineup. Wilson recognized images of both Miller and Gonzalez from the April 13, 1999 photo lineup, but he failed to make a positive identification of either. Fingerprints taken from the stereo in Hill's truck matched Gonzalez.

### b. *April 1, 1999*

In the early evening hours of April 1, 1999, Laura Espinoza and Amor Gonzalez[4] used drugs together and went to a shopping mall, after which they responded to Gonzalez's page and picked up Gonzalez, defendant, and Miller from defendant's

---

[4] Amor Gonzalez and Eloy Gonzalez are unrelated. For ease of reference, Amor Gonzalez will be referred to by her first name, and Eloy Gonzalez by his last name.

apartment. Espinoza stopped to pick up an additional passenger, but that person was not home. She then went to her apartment complex in Tustin, across the street from the Santa Ana Zoo, to pick up a sweater and some CDs. Espinoza parked in the zoo parking lot, then went into her home at around 8:45 p.m. to retrieve the items for which she had stopped, and to page a friend. Once Espinoza left the car, defendant and Miller also got out of the car and walked across the street. When Espinoza returned to the car, the three men — defendant, Miller, and Gonzalez — were gone.

At around 8:00 p.m., Matthew Stukkie and Jesse Muro were walking down Main Street in Tustin, headed away from Stukkie's house, which was located approximately two blocks from the Santa Ana Zoo. As Stukkie and Muro walked past the zoo, they saw Espinoza's car parked across the street in the zoo's parking lot. Muro noticed "a couple people" with shaved heads near the car, and he pointed them out to Stukkie because he "didn't want [any] trouble." Stukkie noted one of the men was tall and slender, while another was stockier and wore a red, Pendleton-style shirt. Immediately after noticing the men, "a couple guys" approached Stukkie and Muro, held "guns to [their] heads, . . . and told [them], 'don't look back; don't look at our face.' "

The man who held a gun to Stukkie's head repeatedly asked Stukkie for money, and Stukkie told him he had none. The gunman took Stukkie's bracelet and pager. Stukkie realized that there were three men behind him at some point, although a gun was pointed at the back of his head and he was unable to fully view the men. Stukkie then heard a gunshot and a scream. Prior to hearing these sounds, Stukkie had only been able to hear the man who held the gun to his head, and he had

lost sight of Muro. Immediately after hearing the gunshot, the gunman told Stukkie to lay on the ground, keep his head down, and not look back or Stukkie would be shot. After lying on the ground for a few minutes, Stukkie got up and went over to Muro. Stukkie told Muro to get up and, when Muro did not respond, Stukkie realized Muro had been shot.

Police arrived a few minutes after Muro was shot. Stukkie flagged down Tustin Police Officer Robert Wright, the first responder to the scene, and directed him toward Muro, who was lying face down on the sidewalk with a pool of blood coming from his head. Muro was breathing when Officer Wright first arrived, and he was transported to the hospital. He died there shortly afterwards from the two gunshot wounds to his head.

Shortly before 9:00 p.m. that same night, Simon Cruz returned to his apartment complex on Main Street in Tustin, across the street from the zoo. As Cruz entered the complex, a man walked up behind Cruz, pointed a black gun at the back of Cruz's head, and told Cruz to give him "the money." He told Cruz to remove his watch, searched his pockets, and took his wallet. A second man walked up to the gunman and told Cruz's assailant, in Spanish, that they needed to leave. The two men began walking away and Cruz followed, asking that they take the money from his wallet but leave the wallet itself because it contained important paperwork. The gunman turned to Cruz, warning him to " 'go back or I will shoot you.' "

Cruz tried to report the theft to the apartment complex's manager, who told him to call the police. Before doing so, Cruz decided to search the complex to see if his assailants had discarded his wallet while fleeing. During his search, Cruz saw

a body on the ground near the apartment complex's exit, with paramedics and police already on the scene.

Cruz later described the gunman to the police as a Spanish-speaking male between the age of 18 and 20, who was approximately six feet tall, and thin, wearing a red Pendleton-style shirt and bandana.

On April 1, 1999, Alexei Sandoval, who lived with his wife at the Park Place Apartments on Main Street, was watching television when he heard two gunshots, about three seconds apart, at around 8:40 or 8:50 p.m. Amor also heard two gunshots in rapid succession, and she heard a scream.

Shortly before the gunshots had sounded, Espinoza returned to the car and was waiting with Amor for Gonzalez, Miller, and defendant to return. After the gunshots sounded, Gonzalez and Miller ran back across the street and got into the car. Espinoza remembered Gonzalez and Miller acted in an excited fashion. Amor testified that Gonzalez and Miller "sounded like they were in a hurry and . . . serious." Espinoza heard Miller say something to the effect that he saw "his brains come out of his head."

Although defendant had not returned to the car with Gonzalez and Miller, Amor saw defendant standing near a motel shortly after Espinoza drove out of the parking lot and down Elk Lane. Defendant rushed over to the car and got in. Amor recalled Miller and Gonzalez mutter, " 'fucking Peewee,' " and Espinoza heard the two men yelling at defendant, saying they "should kick his ass for this," that he would "regret it for the rest

of his life," and "he was going to get taxed for" it.[5] Espinoza overheard defendant explain that one of the reasons he shot Muro was that Muro was getting up.

Espinoza drove to defendant's apartment and dropped him off. Espinoza, Gonzalez, Miller, and Amor then rented a room at a Motel 6 in Stanton, and consumed drugs and alcohol together.

### c. *Investigation and Arrests*

Just after midnight on April 2, 1999, Orange County Deputy Sheriff Christopher Cejka was patrolling the parking lot of the Motel 6 in Stanton, where he had previously made numerous stolen vehicle and narcotics-related arrests. Deputy Cejka saw Espinoza, Amor, and Miller sitting inside a grey Nissan Maxima and Gonzalez standing outside of it. Deputy Cejka asked Gonzalez what the four were doing, and Gonzalez responded that they were motel guests and were planning to get something to eat. Deputy Cejka "noticed some . . . beer bottles sitting around. [He] asked [Gonzalez] about that. [Gonzalez] said that he and Miller had been drinking a beer in the room earlier." This prompted Deputy Cejka to call for backup, conduct patdowns of Gonzalez and Miller, and search the car.[6]

During the search, Deputy Cejka found the wallet that had been stolen from Cruz under the front passenger seat. He

---

[5]     Espinoza explained that "to get taxed" meant that defendant was "going to get his ass kicked."

[6]     Although Espinoza asserted to Deputy Cejka in the Motel 6 parking lot that the Maxima belonged to her brother, and she consented to the deputy's search of the car, Amor testified that she and Espinoza knew the car was stolen.

also searched Miller, finding a key to a room at the Motel 6. Deputy Cejka's search of Gonzalez revealed $950 in cash. Tustin Police Officer Jeff Blair searched Gonzalez, finding the bracelet stolen from Matthew Stukkie in Gonzalez's pants pocket. A search of room 133 at the Motel 6 revealed defendant's driver's license and Amor's phone book. The phone book appeared to have gang style writing on it. On the back of the book was written the name "Scrappy," coperpetrator Gonzalez's moniker, along with the date of Muro's murder: April 1, 1999.

Police interviewed Amor and Espinoza in the early morning hours of April 2, 1999, and Espinoza told them about picking up defendant, Miller, and Gonzalez the day before. Ultimately, Espinoza brought the police to defendant's home.[7] Detective Donnie Kennedy testified that the Tustin Police Department determined that defendant was on probation[8] and subject to a search condition. Later that morning, Detective Kennedy and other law enforcement personnel went to defendant's home to conduct a search, found defendant lying on

---

[7] Amor and Espinoza were interviewed again about a year later, on May 9, 2000 and April 4, 2000, respectively. Both had been charged with murder and robbery, but became the primary witnesses against defendant through plea bargains. Amor ultimately pleaded guilty to two charges of robbery, and was released from juvenile custody after truthfully testifying, consistent with her agreement. Espinoza pleaded to a time-served sentence for two counts of robbery in exchange for her testimony.

[8] Defendant's probation arose from an unrelated 1998 case in which defendant pleaded guilty to two misdemeanors, possession of a deadly weapon (§ 12020, subd. (a), reduced according to the People's § 17, subd. (b) motion) and possession of 28.5 grams or less of marijuana (Health & Saf. Code, § 11357, subd. (b)).

a pullout couch in the living room, and recovered a gun from under a chair cushion in the living room. A further term of defendant's probation prohibited him from possessing a firearm. Also found in defendant's home were depictions of gang-related graffiti, specifically referencing Southside — the gang to which Miller, Gonzalez, and defendant belonged, according to Officer Blair's testimony — along with defendant's and coperpetrator's monikers. A search of Miller's home revealed further evidence of gang participation, including an image of a Southside roster listing Gonzalez, Miller, and defendant's monikers.

Bullets and shell casings recovered from the scene of Muro's murder were matched to the .380-caliber Lorcin semi-automatic, magazine-fed pistol with a missing safety, which was found in defendant's home. The autopsy report revealed that Muro suffered two gunshots to his head, one potentially and the other certainly lethal. Police also lifted a palm print from the trunk of a Nissan Sentra parked near where Muro was shot, which was later matched to defendant. The parties stipulated that the wallet belonging to Muro was found in some bushes near the Santa Ana Zoo along Elk Lane, near where defendant returned to the car with Amor, Espinoza, Miller, and Gonzalez.

### 2. Defense Case

#### a. March 30, 1999

Hugo Vargas, defendant's older brother, testified that on March 30, 1999, he attended his grandmother's birthday party at his mother's apartment, where defendant also lived. Defendant was present at the party when Hugo arrived about 6:00 p.m. Defendant, known to his family as "Eddie" and "Lalo,"

but not "Peewee," stayed for the entire party. When Hugo left around 9:00 p.m., defendant was sitting on the couch watching television.

Defendant's sister, Nylda Anaya, testified that she lived in the apartment next to her mother's. On March 30, 1999, she attended her grandmother's birthday party with her children, staying from about 6:00 p.m. until about 9:00 p.m. Defendant was at the party the entire time she was there and remained in his mother's apartment after Anaya left. Defendant's mother, Nilda Quintana, testified that she, her mother, and defendant remained in the apartment after the gathering ended at around 9:00 p.m. on March 30. Quintana went to bed around 10:30 p.m.; defendant was sitting on the living room couch watching television.

### b. *April 1, 1999 — April 2, 1999*

When Quintana returned home from work at 3:30 p.m. on April 1, 1999, defendant was at their apartment with Miller and Gonzalez. Quintana went to her bedroom and closed the door to watch videos privately because she did not like Gonzalez. She left her room to make herself dinner around 7:00 or 7:30 p.m., noting that defendant was still home but his friends had, by then, left the apartment. Quintana returned to her room to watch television, leaving her bedroom door open. Quintana could not see defendant from her bedroom, but she was able to hear him talking on the telephone. Around 8:30 p.m., she heard the front door open and assumed it was defendant leaving. About 15 minutes later, she heard the front door again, and assumed it was defendant returning home. At 10:00 p.m., she left her room to go to the kitchen and saw defendant standing

on the patio smoking a cigarette. She joined him on the patio, and they talked for 15 or 20 minutes.

Around 4:30 a.m., Quintana woke up and saw a light on in the living room. Defendant was cleaning his shoes, and he told her he was getting ready for an appointment the next day at Target. When she left the house to go to work at 7:00 a.m., defendant was sleeping.

Guadalupe Tinoco, defendant's neighbor, testified that she saw defendant in the apartment complex on April 1, 1999 around 5:30 p.m. and again four hours later, when defendant was on his patio talking on the telephone.

Defendant's girlfriend, Mireida Hermosa, met defendant days before his arrest, on March 28, 1999. Hermosa testified that the two were contemplating marriage at the time of his trial. Defendant and Hermosa met at a Carl's Jr. restaurant where they exchanged phone numbers. She and defendant spoke on the phone for hours every evening after that. On April 1, Hermosa had a series of phone calls with defendant beginning around 7:00 p.m. The first conversation lasted for about an hour; the second conversation occurred 20 to 30 minutes after the first and also lasted for about one hour; and the third phone call spanned several hours, with the couple concluding their conversation at 3:30 a.m. Hermosa believed defendant was drinking throughout the night because his speech became more slurred during each conversation.

Robert Phillips testified that on April 1, 1999, he was living and working at the Park Place apartments. Around 5:30 to 6:00 p.m., he observed a group of three Hispanic men standing by the front gate of the apartment complex, one of whom was wearing a red plaid flannel shirt and a red bandana. He later

identified defendant from a photographic lineup, but was unable to definitively identify anyone else, although he noted one other photograph was reminiscent of one of the men he saw that day.

Nannie Marshall, the Park Place apartment complex manager, testified that she also encountered a group of three men in the early evening hours of April 1, including a man in a red flannel shirt and bandana. As she tried to leave the apartment complex's parking lot around 6:00 p.m., the men stood in the driveway blocking her exit, eventually moving to let her pass. She was gone for approximately 30 minutes. When she returned to the apartment complex, one of the residents, Cruz, informed her he had just been robbed by a man who placed a red bandana across his face and demanded his wallet. She advised Cruz to call the police and, as she was doing so, heard two gunshots "very close together." Marshall, Cruz, and other apartment residents ran to the front of the building; Marshall saw someone lying on the ground, and she spoke to the police shortly thereafter.

Officer Charles Celano spoke with witness Santiago Martinez, who was driving near the Park Place apartment complex looking for a parking spot on April 1, when he saw four men involved in a fight. Martinez identified two of the men as Stukkie and Muro, although he acknowledged he was not paying significant attention to the fight as he wished to leave the area as quickly as possible out of fear for his family's safety.

Marlon Aguirre owned the Nissan Sentra from which police recovered defendant's palm print. The Sentra was impounded on April 1, 1999; Aguirre had no recollection of when, prior to that date, the car had been washed.

Detective Michael Lamoureux seized several items of clothing from defendant's home on April 2, 1999. Detective Lamoureux showed the seized clothing, including black pants, a white shirt, a blue jacket, and a black jacket, to Stukkie, who was unable to identify any of the items as having been worn by his assailant.

Dr. Scott Fraser, a neurologist and expert in eyewitness identification, testified about the reliability of eyewitness identifications, enumerating several reasons why an eyewitness identification might be incorrect.

Michelle Stevens, a forensic scientist for the Orange County Coroner's Office, testified about defendant's level of intoxication around the time of the murder and his possible impairment.

David Carpenter, a private investigator hired by the defense, testified about the distance between defendant's home and the site of the Baek and Kim robbery, as well as the site of the WorldNet Pager store. Carpenter testified that the Baek and Kim robbery site was less than a minute from defendant's home, and that it could have taken defendant about 12 minutes to reach the WorldNet Pager store after returning home from that robbery and remaining inside his home for about two minutes.

On October 27, 1999, Baek participated in a live lineup at the Orange County jail, observed by defendant's former defense attorney Donald Rubright. Rubright testified that defendant was in the third position in the lineup and Baek, who had been instructed to be silent, "said audibly so that everyone in the room could hear 'maybe number 3.'" Baek was told not to audibly comment and was given a form to indicate whether he

could make an identification from the lineup. As the form was being taken from Baek, Rubright heard him say, " 'maybe.' " Rubright noted that Baek failed to positively identify any suspect on the form he was given, but in the comment section of the form Baek had written, " 'maybe number 3,' and he put a dash 'younger' and then a question mark." Finally, as Baek was walking out, Rubright heard him ask, " 'Did I pick the right guy,' " to which no negative response was given.

### 3. Rebuttal

Sergeant Tarpley testified that he spoke with defendant's mother on April 2, 1999 and asked her about her son's whereabouts between 8:30 and 9:00 p.m. the night before. She told him she did not know, because defendant had been "in and out of the house throughout the evening." She also told him that defendant had been with Gonzalez and Miller on the night of April 1, 1999.

## B. Penalty Phase

### 1. Prosecution Case

Jesse Muro's family described the impact of his death on them. Three of Muro's cousins and his father testified about his life and his connection to the family.

Leticia Orosco, Muro's cousin and godmother, testified she was close to Muro and thought of him as a younger brother. Muro had been very close to her children and he had "a special bond with animals." Orosco described the tragedy of losing Muro two weeks before his 18th birthday, testifying that the family held Muro's birthday celebration despite his death. Orosco testified that she learned of Muro's death, had to tell her

mother, and rushed to the hospital "too late." The holidays — particularly Easter and Muro's birthday — are difficult for the family, but Orosco said they "cope" by going "to his tombstone. That is all we have left."

Gloria Cervantes testified that Muro was the "baby cousin of the family" and they got along well, enjoying a humor-filled relationship. Muro was "just fun loving, a big kid," who loved Cervantes's two children, and had a fondness for baseball. Cervantes thinks of Muro daily, particularly about the manner of his death, and she most misses "his smile, his goofiness."

Arturo Jimenez, Muro's cousin, also testified. Because Jimenez did not have a younger brother and Muro lacked an older brother, the two "formed this big brother, little brother relationship, and that is how [they] referred to each other." Jimenez, along with Muro's father, coached Muro's little league team, Muro and Jimenez went on hikes and dirt bike rides in the desert, and Muro assisted with Jimenez's photography work. Jimenez testified that finding out Muro had died "was almost like [an] ethereal situation." He explained that he and family members learned of Muro's death, drove to the hospital, met with a bereavement counselor, and prayed. Jimenez testified about the impact Muro's death had on him, and his difficulty coping with it. Finally, he described the "terrific kid" Muro had been, echoing his cousin's testimony that Muro was an animal lover and good with children.

Finally, Muro's father, Jesse Muro, Sr., testified about the impact his son's death had on him, explaining what it was like when police came to his door to tell him his son had been shot and later, at the hospital, when he was told to "sit down" because his " 'son didn't [make] it.' " Muro, Sr., testified he "went a little

bit crazy like anybody would" in that moment. He had to call his relatives to tell them that his son was dead, and he had to identify his son, which "was probably one of the hardest things [he] ever had to do in [his] lifetime." Muro, Sr., testified that "they took [him] away from the family, and then they showed [him] the picture of his [son's] face, and it was full of blood. They asked [him] if this was my son, and [he] told them yes, it is." Muro, Sr., described the many people that came to his house to pray for his son, explaining that there is always at least one candle burning for him. Muro, Sr., testified that he often goes to the cemetery to lay flowers at his son's gravesite, and prays there before work almost daily. Muro, Sr., was deeply affected by his son's death, in part because, after his son's death, he continued to go every morning to the local 7-Eleven near where his son was murdered, and he saw "there is still . . . paint where they painted to cover the blood. And [he] can't help [having to pass the location] because [he] live[s] around there. Every[]time [he] pass[es he] tell[s] him, 'Rest in peace, my son. May the Lord be with you in Heaven.' "

### 2. *Defense Case*

Quintana testified defendant was the youngest of her five children. Defendant's parents divorced when he was young and Quintana moved with four of her children to the United States, with her eldest son remaining in Mexico. Quintana moved in with her mother, Bertha Barocios, with whom defendant was still living at the time of his arrest.

Defendant was a "pretty good" student in elementary and junior high school. In high school, he began to get in trouble and use marijuana; his grades became "flaky," and he was suspended. After changing high schools three times due to

17

various moves, suspensions, and expulsions, defendant was referred to continuation school, where he completed the units for 12th grade, but never received a high school diploma.

In 1995, defendant's family tried to convince him to visit his father in Mexico; defendant refused to take the trip and ran away from home for several days. Defendant again refused to visit his father in 1997, a trip his mother thought would be helpful to "straighten[ him] out," which she thought was necessary due to his poor attitude toward her and the inferences she drew from his preference for wearing baggy clothing. Despite her concerns, she testified that defendant consistently treated children and his elders with respect.

Cesar Vargas, one of defendant's brothers, testified that their father had been strict with all of the children, but was most lenient with defendant. Although Cesar's contact with defendant was limited after he moved out of Quintana's home in the early 1990's, he recalls both from the time he lived with defendant and from the time after he moved that defendant was respectful and courteous toward others.

Hugo Vargas, another of defendant's brothers, testified that he visited his mother weekly and saw defendant during those visits. Although defendant "had a little change in his attitude" between the ages of 13 and 15, and failed to listen to his mother, Hugo "intervene[d] in a good, positive way" to remind his brother "to kind of follow our values that we had with our father like respect the house and everything." His intervention was successful; other than wearing baggy clothing, Hugo noted no change of behavior later in defendant's teen years, around age 18 or 19. Hugo testified that defendant was

not disrespectful, and was particularly respectful toward his elders and good with children.

Nylda Anaya, defendant's sister, testified that defendant was a playful child who earned good grades in school. Anaya recalled that defendant was babied and given special privileges because he was the youngest child in the family. Anaya moved out of their mother's house in 1991; between 1991 and 1994 she saw defendant regularly and his behavior was good. She moved out of state for a year and when she moved next door to her mother's apartment upon her return to California in 1996, the only changes she noted in her brother were his "shaved head" and "baggy clothes, too big for him." Between 1996 and 1999, defendant spent much of his free time drinking and hanging out with friends; he did not have a steady job. Since his arrest, defendant had expressed sorrow and become more religious.

Chris Miller, Matthew Miller's father, testified that defendant worked on two or three jobs as a "helper" on Chris's paint crew, and that between 1988 and 1997 defendant was a courteous young man.[9] In 1995, Chris noticed Miller and defendant began wearing baggy clothing and cut their hair short, which he thought could lead to "some trouble," and he warned them they could be "involved in . . . a drive-by or something just because of the way they looked." Just before Christmas 1998, Chris noticed Miller and defendant both had a "harder edge"; they were more serious and not as "happy-go-lucky."

---

[9] Because we refer to Matthew Miller by his last name, Chris Miller will be referred to using his first name, to avoid confusion.

Mark Kent, defendant's youth pastor, testified he saw defendant, at most, twice monthly between 1991 and 1993. During that time, defendant was a respectful young man who did not have issues with authority. The last time Kent saw defendant was in 1995. Although Kent did not notice a change in defendant's demeanor, Kent observed a change in defendant's appearance: He had a shaved head and was wearing baggy clothing.

Dr. Ted Greenzang, a psychiatrist, testified for the defense after reviewing defendant's history and interviewing defendant and his family. In Dr. Greenzang's opinion, defendant was an "at risk youth." He based this opinion on numerous factors, including defendant's family's low socioeconomic status. Dr. Greenzang also found relevant the fact that defendant's mother had an intrauterine device implanted to prevent pregnancy when she became pregnant with defendant, which he inferred meant that defendant "was the product of an unplanned, unwanted pregnancy." Other factors included "separation of the family, breakup of the home, [and] lack of male role models." Dr. Greenzang characterized defendant as an "underachiever" of "low-average" intelligence. Finally, defendant's self-esteem issues, impulsivity, heavy drinking, daily use of marijuana, and use of amphetamines and cocaine brought about, in Dr. Greenzang's opinion, some paranoia, irritability, and impaired judgment.

Dr. Ines Colison, a forensic toxicologist charged with looking for drugs in biological samples, testified that defendant's blood sample — taken on April 2, 1999, at 11:50 a.m. — contained a nearly undetectable amount of

methamphetamine.[10]   Defendant's blood was negative for opiates, cocaine, and barbiturates.

Defense Investigator David Carpenter testified he met with defendant 15 to 20 times in face-to-face meetings.  Prior to his conviction, defendant expressed remorse on multiple occasions.  On February 15, 2000, defendant asked Carpenter, unsolicited, if he could speak to the Muros.  Defendant wanted to communicate with the Muros "off the record" because "he wanted to convey to them that he was sorry that they lost a family member. . . .  That he felt very badly for what they were going through."  Carpenter explained it was unlikely defendant would be granted permission to speak with the Muro family.  Defendant told Carpenter he hoped the family would forgive him; he tried to say something else but began crying and could not finish his thought.  Carpenter attempted to provide defendant with as much privacy as the small visiting space allowed, ultimately suggesting that defendant write a letter to the Muro family, which he did.

## II.  PRETRIAL ISSUES

### A.  Denial of Motion to Suppress Evidence

Defendant contends the trial court erred by denying his motion to suppress evidence seized during a warrantless probation search of his home on April 2, 1999.  He argues the

---

[10]   The concentration of methamphetamine in defendant's blood was 33 nanograms per milliliter.  The cutoff for detection is 25 nanograms per milliliter; any amount of methamphetamine below that amount is considered undetectable.  The half-life of methamphetamine is between seven and 15 hours, rendering it impossible to determine precisely when defendant ingested the drug.

search was improper, because he did not provide a valid waiver of his Fourth Amendment rights when he was placed on probation. We conclude the condition of probation was valid, rendering the warrantless search constitutionally permissible.

### 1. Background

On April 2, 1999, before traveling to defendant's home intending to conduct a search, Detective Lamoureux reviewed a court order indicating defendant was on probation and subject to a search condition. Then, at around 8:30 a.m., he and other officers conducted a warrantless probation search of defendant's home. Detective Lamoureux knocked on defendant's slightly ajar door. From his vantage point outside the house, Detective Lamoureux could see defendant laying on a fold-out couch; Lamoureux then saw defendant's hand begin moving. After waiting 20-30 seconds, the detective entered defendant's apartment, then "climbed up on to the bed . . . and secured [defendant's] hands because of . . . suspicion [detectives] . . . hadn't recovered [a firearm] yet."

Detective Kennedy entered defendant's home after Detective Lamoureux, placed handcuffs on defendant, and formally arrested him; he then asked defendant if he was on probation and subject to a search condition. Defendant answered those questions affirmatively. Detectives searched defendant's home and seized two firearms, both found in a chair near the bed: a Lorcin semiautomatic and an AK-47. Although the AK-47 was alleged not to have been used in connection with the crimes in this case, the Lorcin was purportedly used in the Muro homicide, and bullet casings matching that weapon were found at the scene of the Muro shooting.

In a motion under section 1538.5, filed in the trial court, defendant sought to suppress the firearms seized from his residence, arguing that the search was invalid because it arose from a defective condition of probation. In his motion to suppress, defendant asserted that he did not "read or receive[] a copy of his summary probation order," and he urged the trial court to find the search condition invalid because he did not sign the disposition/minute order placing him on probation and subjecting him to a search condition.

The trial court rejected this argument, stating that "before there is a plea, . . . defendants know what they are pleading to and what the consequences of the plea are going to be. And the judge made those findings, and then goes through the conditions of probation, specifically spelling out the search and seizure condition. And there is no objection by either counsel or your defendant, so there is no — [defendant] was aware of and agreed to voluntarily because of the disposition reached in that case to accept the search and seizure condition." The court suggested defendant "could get on the stand and say, 'I wasn't there, and nobody told me [I would be subject to a search condition],' but we don't have that evidence." Defense counsel acknowledged his understanding, and the court replied, "I know you understand that. But you are not going to submit your client to perjury. I understand *that*. . . . It is clear that there was a valid order and a waiver." The motion to suppress was denied.

### 2. Discussion

The Fourth Amendment protects " '[t]he right of the people to be secure in their persons, houses, papers and effects, against unreasonable searches and seizures' by police officers and other government officials." (*People v. Robles* (2000) 23

Cal.4th 789, 794, quoting U.S. Const., 4th Amend.) The crux of Fourth Amendment analysis is whether a person has a reasonable, constitutionally protected expectation of privacy: "a subjective expectation of privacy in the object of the challenged search that society is willing to recognize as reasonable. [Citations.] [¶] '[P]rivate residences are places in which the individual normally expects privacy free of governmental intrusion not authorized by a warrant, and that expectation is plainly one that society is prepared to recognize as justifiable.' " (*People v. Robles*, *supra*, at p. 795, quoting *United States v. Karo* (1984) 468 U.S. 705, 714.)

A search without a warrant is unreasonable under the Fourth Amendment, unless it fits in one of a few narrow exceptions allowing for warrantless searches. (*People v. Schmitz* (2012) 55 Cal.4th 909, 916.) One such exception is a valid probation condition authorizing warrantless searches. (*People v. Robles*, *supra*, 23 Cal.4th at p. 795; see also *People v. Ramos* (2004) 34 Cal.4th 494, 506.) In exchange for avoiding service of a prison term, a probationer may consent to future warrantless searches. (*People v. Woods* (1999) 21 Cal.4th 668, 675.)

Defendant argues, as he did at the trial court, that the probation search condition here was invalid because it was not furnished to him in writing as he alleges was required under section 1203.12,[11] and there was no direct evidence presented at

---

[11] Section 1203.12 provides, "The probation officer shall furnish to each person who has been released on probation, and committed to his care, a written statement of the terms and conditions of his probation unless such a statement has been furnished by the court, and shall report to the court, or judge, releasing such person on probation, any violation or breach of

the suppression hearing — whether through the sentencing transcript or witness testimony — that he knowingly, freely, and voluntarily consented to warrantless searches when agreed to be placed on probation.  Defendant's argument lacks merit.

The trial court's process of analyzing a motion to suppress, we have explained, calls for a three-step inquiry:  The trial court " 'find[s] the historical facts, select[s] the rule of law, and appl[ies] it to the facts in order to determine whether the law as applied has been violated.' " (*People v. Letner and Tobin* (2010) 50 Cal.4th 99, 145.)  We review de novo a trial court's resolution of the legal questions resolved in a suppression motion, and we review the trial court's resolution of factual issues under the more deferential substantial evidence standard. (*Ibid*.)  We are concerned with the propriety of "the trial court's ruling *itself*, not the correctness of the trial court's *reasons* for reaching its decision." (*Ibid*.)

Here, substantial evidence supports the trial court's determination that when defendant was placed on probation he freely, voluntarily, and knowingly waived his Fourth Amendment rights as a condition of probation.  The clerk's minutes indicate that defendant had been advised of his plea's consequences.  To wit, he was "ordered to SUBMIT your PERSON and PROPERTY including any residence, premises,

_____

the terms and conditions imposed by such court on the person placed in his care."  By its terms, section 1203.12 addresses only formal probation; defendant was placed on informal probation, and it is not clear that section 1203.12 applies.  We note also that the rights conferred under section 1203.12 are "statutory; not of constitutional dimension." (*Freytas v. Superior Court* (1976) 60 Cal.App.3d 958, 962.)  That is, even were we to find a statutory violation — and we do not — defendant's Fourth Amendment rights may not be implicated.

container, or vehicle under your control to SEARCH and SEIZURE at anytime [*sic*] of the day or night by a police or probation officer with or without a warrant or probable cause." The trial court was able to consider the clerk's minutes in evaluating defendant's suppression motion because they were attached as an exhibit to the district attorney's opposition to the motion. Defense counsel acknowledged as much when conceding before the trial court that the "clerk's minutes indicate[d] maybe there might have been some communication" to defendant concerning the search condition.

Defendant now argues that it is improper to conflate defendant's change of plea proceedings with his grant of probation proceedings. Defendant contends that the plea agreement did not address his sentence; it simply indicated the possible consequences of a guilty plea. Thereafter, a probation recommendation with a search condition was made, which does not, in defendant's view, evince defendant's knowledge or consent of the probation condition. Defendant's argument is unpersuasive. The clerk's minutes reflect that defendant "underst[ood] the nature of the charge(s) against him[]," "WITHDR[E]W[] [HIS] PLEA OF NOT GUILTY . . . AND ENTER[ED] A PLEA OF GUILTY," was "placed on INFORMAL PROBATION for a period of 3 YEAR(S)," and a had a search condition imposed — all during the same proceedings. To the extent defendant contends the forms imposing a probation condition are distinct from those evincing a change of plea, that is certainly true. But that distinction is without difference as to the propriety of the suppression motion. Indeed, the proceeding during which defendant changed his plea and accepted a search condition were one and the same.

While it does not appear the trial court gave significant weight to the clerk's minutes, we need not agree with the trial court's reasoning to find its ruling proper. (*People v. Letner and Tobin*, *supra*, 50 Cal.4th at p. 145.) The trial court concluded that a plea cannot be taken without certain advisals, including one regarding imposition of a search condition, which it presumed was provided here. The court explained, "the history and practice of the courts" is to ensure defendants understand the nature of a plea so they "know what they are pleading to and what the consequences of the plea are going to be." The court added that, after advising a defendant regarding the nature of the plea, they would be apprised of "the conditions of probation, specifically spelling out the search and seizure condition." The trial court ruled that there was "no question in this court's mind that [defendant] was aware of and agreed to voluntarily . . . accept the search and seizure condition."

Taking into account the totality of this record, we find the trial court's ruling proper. (See *People v. Letner and Tobin*, *supra*, 50 Cal.4th at p. 145 [considering "correctness of the trial court's ruling *itself*, not the correctness of the trial court's *reasons* for reaching its decision"].) In addition to the clerk's minutes indicating the court advised defendant of the consequences of his plea, defendant told officers he was subject to a probation search condition when they entered his home. His acknowledgment of the condition to officers suggested he understood the advisals applied. The clerk's minutes and defendant's acknowledgment belie his assertion that he was not furnished with or did not sign the disposition/minute order. Defendant was also invited to present evidence that ordinary advisements were not provided, and he declined to do so. We

conclude the trial court committed no error denying defendant's motion to suppress.

## B. Denial of Motion to Sever the Capital Charges

Defendant contends the trial court's denial of his motion to sever the capital charges stemming from the Muro robbery and murder, the Stukkie robbery, and the firearm possession (counts 1, 2, 3, and 5) from his remaining charges constituted an abuse of discretion under state law and violated his federal constitutional right to due process and his right to be free from cruel and unusual punishment. We conclude this claim lacks merit: No abuse of discretion occurred at the time the trial court denied the motion, nor did joinder of the charges result in gross unfairness.

### 1. Background

Before trial, defendant moved to sever the Muro, Stukkie, and firearm charges — which made him eligible for a sentence of death — from the remaining charges. In his severance motion, he argued the types of charges were not distinctive enough to be cross-admissible as to identity,[12] the murder charge was likely to inflame the passions of the jury, and joinder would bolster the weaker charges. The prosecution opposed the motion, arguing that the evidence was cross-admissible to show identity, common plan or scheme, that the murder occurred during a robbery, and that the crimes were committed in furtherance of gang activities. The prosecution further argued

---

[12] The remaining charges defendant sought to sever were the Cruz robbery (count 4), two counts of active participation in a criminal street gang (counts 7 and 12), the Hill robbery (count 8), the Wilson robbery (count 9), the Baek robbery (count 10), and the Kim robbery (count 11).

that none of the charges were weak and that there was not a substantial likelihood of prejudice. At the hearing on the motion, the court indicated it did not "know how in good conscious [*sic*] [it] could sever" the Muro, Stukkie, and firearm counts from the remaining charges, but provided defense counsel an opportunity to argue the motion; defense counsel declined, submitting on the moving papers alone. The court denied severance, explaining that the capital and noncapital charges were essentially the same type. Defense counsel inquired whether the denial was without prejudice, and the court confirmed all severance denials were without prejudice.

### 2. Discussion

Because consolidating or joining actions is efficient, there is a preference to do so. (*People v. O'Malley* (2016) 62 Cal.4th 944, 967 (*O'Malley*).) As we explained in *O'Malley*, section 954 furthers this efficiency goal by permitting different types of offenses to be charged in the same pleading if they are " 'connected together in their commission' " or if they are " '*the same class of crimes or offenses.*' " (*Ibid.*, quoting § 954.) Here, as in *O'Malley*, the "murder[, robberies,] and the related charges . . . are of the same class, because they are all ' "assaultive crimes against the person." ' " (*O'Malley*, *supra*, 62 Cal.4th at p. 967.) The charges would therefore be properly joined unless the defense could have made such a " ' "clear showing of potential prejudice" ' " that denying the severance motion would have constituted an abuse of discretion. (*Id.* at p. 968.) That did not occur in this case.

We review a trial court's denial of a severance motion for abuse of discretion based on the record before it at the time of that denial. (*People v. Armstrong* (2016) 1 Cal.5th 432, 456;

*O'Malley, supra,* 62 Cal.4th at p. 968.)  We assess four factors; first, we consider "whether evidence of the crimes to be jointly tried is cross-admissible." (*O'Malley, supra,* at p. 968.)  Second, we address whether the charges are especially inflammatory. Third, we consider whether a weak case has been joined to a strong one "so that the spillover effect of aggregate evidence might alter the outcome of some or all of the charges." (*Ibid.*) Finally, we consider whether joinder renders the case capital when it would not otherwise have been. (*Ibid.*)  If the evidence of any of the charged offenses would be " 'cross-admissible' " in hypothetical separate trials of any of the other charges, that is enough "standing alone, to dispel any prejudice and justify a trial court's refusal to sever the charged offenses." (*Alcala v. Superior Court* (2008) 43 Cal.4th 1205, 1221.)

Here, in its opposition to the severance motion, the prosecution argued the evidence was cross-admissible to show common plan or scheme, identity, and that the crimes were committed in furtherance of the criminal street gang. " ' "[O]ther crimes" evidence is admissible under Evidence Code section 1101, subdivision (b) "when offered as evidence of a defendant's motive, common scheme or plan, preparation, intent, knowledge, identity, or absence of mistake or accident in the charged crimes." ' [Citation.] 'In this inquiry, the degree of similarity of criminal acts is often a key factor, and "there exists a continuum concerning the degree of similarity required for cross-admissibility, depending upon the purpose for which introduction of the evidence is sought:  'The least degree of similarity . . . is required in order to prove intent . . . .' . . . By contrast, a higher degree of similarity is required to prove common design or plan, and the highest degree of similarity is

required to prove identity." ' " (*People v. Erskine* (2019) 7 Cal.5th 279, 295 (*Erksine*).)

Here, a series of armed robberies took place. This gave rise to seven charged robbery offenses, two of which defendant sought to sever from the remaining five. The prosecution argued against this parsing of offenses, reasoning that all four robberies took place in the same geographic area, occurred over just three days, and involved the same three perpetrators threatening their victims with firearms. Evidence concerning defendant's gang affiliation was admissible across charges to prove both the gang enhancements and active participation counts. As the Attorney General points out, the offenses shared additional similar characteristics, including defendant approaching a victim, brandishing a black gun, and demanding money.

Defendant argues these similarities are not sufficiently specific to demonstrate identity — the purpose under Evidence Code section 1101, subdivision (b) demanding " 'the highest degree of similarity' " between criminal acts — and the evidence is thus not cross-admissible. (*Erksine, supra*, 7 Cal.5th at p. 295.) He argues that none of the evidence to which the prosecution refers is unique to this set of crimes, claiming his were "typical armed robberies" lacking "distinctive characteristics to prove that anyone other than [defendant] could have committed them."

Although we are inclined to conclude that the characteristics of the offenses are sufficiently similar to find that the evidence would be cross-admissible even for identity (see *Alcala v. Superior Court, supra*, 43 Cal.4th at p. 1221), those similarities would certainly be cross-admissible on the issues of common plan or design and of intent. (*People v. Daveggio and*

*Michaud* (2018) 4 Cal.5th 790, 827.)  As we have explained, " '[t]he least degree of similarity (between the uncharged act and the charged offense) is required in order to prove intent.' [Citation.]  Evidence is admissible for these purposes if there is 'sufficient evidence for the jury to find defendant committed both sets of acts, and sufficient similarities to demonstrate that in each instance the perpetrator acted with the same intent or motive.' " (*Ibid.*)  In order to demonstrate the existence of a *common* design or plan, the prosecutor must show that " 'the common features must indicate the existence of a plan rather than a series of similar spontaneous acts, but the plan thus revealed need not be distinctive or unusual.' " (*Id.* at p. 828, quoting *People v. Ewoldt* (1994) 7 Cal.4th 380, 403 (*Ewoldt*).)

The same three assailants — defendant, Miller, and Gonzalez — were involved in four robberies.  In both the Baek and Hill robberies, defendant pointed a gun at his victims and stole their wallets.  Cruz and Stukkie were similarly robbed at gunpoint, with weapons held to the backs of their heads.  Finally, the crimes were temporally and physically proximate.  The similarities between the four robberies — that they occurred at gunpoint by the same assailants in physically proximate areas within the span of a few days — "provided a sufficient basis for the jury to conclude that defendant[] acted with the same criminal intent or motive, rather than by ' "accident or inadvertence or self-defense or good faith or other innocent mental state." ' " (*People v. Daveggio and Michaud*, *supra*, 4 Cal.5th at p. 827.)

Likewise, this evidence is enough to support the jury's conclusion that defendant was pursuing a common plan or scheme.  As we described in *Ewoldt*, "evidence that the defendant has committed uncharged criminal acts that are

similar to the charged offense may be relevant if these acts demonstrate circumstantially that the defendant committed the charged offense pursuant to the same design or plan he or she used in committing the uncharged acts." (*Ewoldt, supra*, 7 Cal.4th at p. 403.)  Defendant's robbery charges arose from acts occurring before the Muro crime but followed a substantially similar design:  defendant approached victims, brandished a black gun, and asked them to give him money.  Defendant's assertion that the similarities shared by the offenses is not sufficient fails because, "[u]nlike evidence of uncharged acts used to prove identity," the common design or plan alleged "need not be unusual or distinctive; it need only exist to support the inference that the defendant employed that plan in committing the charged offense."  (*Ibid.*)

Even if we conclude that the trial court was well within its discretion in denying severance pretrial, we must also discern " 'whether events *after* the court's ruling demonstrate that joinder actually resulted in "gross unfairness" amounting to a denial of defendant's constitutional right to fair trial or due process of law.' "  (*People v. Simon* (2016) 1 Cal.5th 98, 129.)  Whether joinder worked a gross unfairness turns upon assessing whether it was "reasonably probable that the jury was influenced by the joinder in its verdict of guilt."  (*Id.* at p. 130.)  Here, "strong evidence warranting conviction" supported all the charges — the Muro murder and robbery offenses, the four charged robbery offenses that defendant conceded were supported by strong evidence, and the remaining firearm and gang offenses.  (*Ibid.*)  Defendant argues it was beyond the bounds of reason for the court to have denied his severance motion, and ultimately for the jury to have convicted him on these joined charges, but that is simply not the case.  This

argument lacks any meaningful support: Defendant fails to articulate a basis demonstrating how joinder was so unfair as to violate his federal constitutional rights, and we find none.

## III. GUILT PHASE ISSUES

### A. Claims of Insufficient Evidence

Defendant claims insufficient evidence supports his convictions of active participation in a criminal street gang, his robbery of Simon Cruz, and his personal discharge of a firearm. Each of these contentions lacks merit.

When a defendant challenges the sufficiency of the evidence for a jury finding, we review the entire record in the light most favorable to the judgment of the trial court. We evaluate whether substantial evidence, defined as reasonable and credible evidence of solid value, has been disclosed, permitting the trier of fact to find guilt beyond a reasonable doubt. (*People v. Rivera* (2019) 7 Cal.5th 306, 323–324.) " 'The standard of review is the same in cases in which the prosecution relies mainly on circumstantial evidence.' " (*Id.* at p. 324.)

We review the sufficiency of the evidence supporting convictions and enhancements using the same standard, presuming " 'every fact in support of the judgment the trier of fact could have reasonably deduced from the evidence.' " (*People v. Rivera, supra,* 7 Cal.5th at p. 331.) If the finder of fact's determination is supported, whether the prosecutor relied upon direct or circumstantial evidence, we have held that reversal is not warranted, even where " 'the circumstances might also reasonably be reconciled with a contrary finding.' " (*Ibid.*)

## 1. *Evidence of Active Gang Participation*

### a. *Gang Evidence Presented at Trial*

Tustin Police Officer Jeff Blair, "Tustin's first and only gang investigator" at the time, presented expert testimony that Miller, Gonzalez, and defendant were all members of the Southside gang, a criminal street gang. Officer Blair worked on over 500 gang cases and had had contact with over 1,000 gang members. Officer Blair was familiar with a number of gang tattoos, which he noted were seen less frequently than in years past because they may be evidence of gang membership when viewed by a jury. Officer Blair testified that a tattoo depicting three dots meaning "my crazy life" was typical of gang membership. Defendant had a tattoo of three dots on his hand.

Officer Blair testified that criminal street gangs habitually maintained rosters regarding membership, and a name would not be listed on a roster if the individual was not a member of a gang. Blair testified that an image of a gang roster found at Miller's home listed Miller, Gonzalez, and defendant[13] as members of the Southside gang.

---

[13] Defendant's name was listed on the roster using the moniker "Peewee," spelled with the letter P, followed by an x intended to signify a period, and then the letters w-e-e. Evidence was presented indicating defendant used this nickname; for instance, in a drawing seized from defendant's home depicting gang signs with the words "brown pride Mexicano" written across it and showing a character wearing a stocking cap, sunglasses, and a revolver pointed at the viewer, the nickname written on the trigger guard of the weapon was "Mr. Pewee [*sic*]."

### b. Discussion

Section 186.22, subdivision (a) states in relevant part: "Any person who actively participates in any criminal street gang with knowledge that its members engage in, or have engaged in, a pattern of criminal gang activity, and who willfully promotes, furthers, or assists in any felonious criminal conduct by members of that gang, shall be punished." Section 186.22, subdivision (b)(1), the so-called "gang enhancement," provides in pertinent part, "any person who is convicted of a felony committed for the benefit of, at the direction of, or in association with any criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members, shall, upon conviction of that felony, in addition and consecutive to the punishment prescribed for the felony or attempted felony of which he or she has been convicted, be punished."

The statutory enhancement is applicable to " 'any person' convicted of a number of enumerated felonies, including murder" and being a felon in possession of a firearm, provided certain conditions are present. (*People v. Rivera, supra*, 7 Cal.5th at p. 331; § 186.22, subd. (b)(1).) The crime must be "(1) 'committed for the benefit of, at the direction of, or in association with any criminal street gang,' and (2) 'with the specific intent to promote, further, or assist in any criminal conduct by gang members.' " (*Rivera*, at p. 331.) If a gang-related crime is committed for the particular purpose of helping members of the gang, the enhancement is applicable, although we have cautioned that " '[n]ot every crime committed by gang members is related to a gang.' " (*Ibid.*)

Defendant contends there was insufficient evidence he was an "active participant" in a criminal street gang rather than, simply, associated with gang members. Specifically, defendant argues he had no history of documented gang affiliation. He claims to have been devoid of any personal knowledge of information exclusive to a gang member, nor did he possess tattoos linking him to a gang. Moreover, he claims the drawings of gang graffiti found in his and Miller's homes and in the Motel 6 room suggested only that he was an aspiring gang member. Defendant's argument misses the point. Our review tests whether the evidence was sufficient, not whether hypothetical evidence would have strengthened the prosecution's case. We conclude it was. As with all sufficiency claims, " '[w]e presume every fact in support of the judgment' " that can be " 'reasonably deduced from the evidence. [Citation.] If the circumstances reasonably justify the trier of fact's findings, reversal of the judgment is not warranted simply because the circumstances might also reasonably be reconciled with a contrary finding.' " (*People v. Rivera*, *supra*, 7 Cal.5th at p. 331.)

Defendant argues that no evidence was presented at trial indicating he had prior gang affiliation. He also conveys that Amor and Espinoza — both Southside gang members — testified that defendant was from "nowhere," meaning he had no gang affiliation. But concluding defendant was unaffiliated with a gang was not the only possible interpretation of the evidence presented at trial; indeed, ample additional evidence was presented showing, or permitting a finder of fact to infer, that defendant (1) actively participated in the Southside gang, (2) was aware that its members — including Miller and Gonzalez — "engaged in a pattern of criminal gang activity," and (3)

promoted the felonious conduct of its members. Officer Blair testified that defendant's name appeared on a roster of Southside gang members. (*People v. Rivera, supra,* 7 Cal.5th at p. 331.) Quintana, defendant's mother, testified that defendant and Miller, another Southside gang member, had been friends since 1987. While in custody awaiting trial, defendant wrote three letters to Miller containing language and slang used by gang members. Quintana also testified that defendant and Gonzalez had been acquainted for some time. Miller and Gonzalez were both known to be Southside gang members.

Defendant argues that the evidence was insufficient to demonstrate that he was an active gang participant, as required by section 186.22, and he argued the statute does not penalize "a person's fantasies of being part of a criminal underworld." We conclude sufficient evidence existed for a factfinder to find defendant's involvement extended beyond the realm of fantasy. A factfinder could surmise that defendant, Miller, and Gonzalez engaged in a pattern of criminal activity together; indeed, all three were present when Baek's stolen credit cards were used at WorldNet Pager. All three participated in the robbery of Hill and attempted robbery of Wilson, and all three were also present during the robbery of Stukkie and the robbery and murder of Muro. Officer Blair testified that gang members regularly commit crimes together to provide each other with "backup." The robberies in this case, he explained, were committed for the benefit of, i.e., to promote the felonious conduct of, the Southside gang. He also testified that the robberies would have financially benefitted the Southside gang, permitting its members to purchase alcohol, drugs, and motel rooms. He also opined that the robberies would have enhanced the gang's reputation as dangerous by instilling fear in community members.

Viewed in the light most favorable to the judgment, this evidence was sufficient for a reasonable juror to have concluded that defendant was an active participant in the Southside gang.

### c. *Request to Reconsider* Castenada

In addition to arguing that the evidence was insufficient to support the jury's verdict, defendant contends that our holding in *People v. Castenada* (2000) 23 Cal.4th 743 (*Castenada*), in which we concluded that the phrase "active participation" used in section 186.22 was not unconstitutionally vague, should be reconsidered.  Defendant argues the statute is unconstitutional and violates principles of due process because it fails to define what constitutes "active participation," and *Castenada*, while upholding the statute, does not sufficiently clarify what is considered "active participation."  (*Castenada, supra*, 23 Cal.4th at pp. 746–747.)  Defendant argues he was harmed by the statute's vagueness because his association with Miller and Gonzalez, along with drawings found in his possession, permitted his conviction under section 186.22 when he and individuals like him would not otherwise have been on notice that such activities would have constituted active participation.  Defendant also contends the statute permits arbitrary and discriminatory enforcement.  He claims, by way of example, that police possess the power to stop any vehicle because it contains an individual wearing a red or blue bandana — transforming that person into a suspected gang member, even if the purpose for wearing such a bandana is as innocuous as gym-going or performing outdoor activities, rather than membership in the Crips or Bloods gangs — simply by justifying the stop under the auspices of presumed active participation under section 186.22.

Defendant's arguments were considered and rejected in *Castenada*, with the exception of the gang member traffic stop hypothetical, and he presents us with no reason to reconsider our holding here. Indeed, in *People v. Albillar* (2010) 51 Cal.4th 47, relying on *Castenada*, we reaffirmed that section 186.22 is not facially ambiguous, which the defendants there conceded. (*Albillar*, at p. 55.) We held that section 186.22's plain language "targets felonious criminal conduct, not felonious gang-related conduct." (*Albillar*, at p. 55.) Here, defendant was not convicted simply because he possessed some drawings and knew gang members. He participated in multiple felonious criminal enterprises with gang members, communicated from prison to gang members, was listed on a gang roster, and had a gang tattoo. Section 186.22 places defendant, and those similarly situated, on notice regarding what conduct is prohibited, raising no due process concerns, and we need not reconsider our holding in *Castenada* concluding the same. (*Castenada*, *supra*, 23 Cal.4th at pp. 746–747.)

### 2. *Evidence of Defendant's Involvement in the Robbery of Simon Cruz*

Defendant claims there was insufficient evidence presented at trial for the jury to convict him of the robbery of Simon Cruz. He argues that Cruz did not identify him, and that two other witnesses, Robert Phillips and Nannie Marshall, described another individual in the area at the time of the robbery, as the more likely perpetrator. We conclude, for the reasons that follow, that defendant's claim lacks merit.

As noted above, we review the record in the light most favorable to the judgment, evaluating " ' " ' "whether it discloses . . . evidence which is reasonable, credible, and of solid value[,]

such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." ' " ' " (*People v. Rivera, supra,* 7 Cal.5th at p. 323.) Defendant complains the evidence was insufficient to convict him of robbery because Cruz did not identify defendant as the assailant, the clothing seized from defendant's apartment did not match the clothing Cruz described his assailant as having worn, no photo array was conducted, and Cruz did not identify defendant or indicate defendant looked like his assailant.

Defendant's argument does not persuade us. What defendant manufactures is essentially a list of evidence that would buttress the prosecution's case. To treat this as dispositive would be to ignore the full range of evidence the jury actually considered. Here, although Cruz did not identify defendant as *the assailant*, Cruz did convey that there were two of them, both Hispanic males between the ages of 18 and 20 years old. Cruz also testified that one of his assailants wore a red, Pendleton-style shirt, which is consistent with Stukkie's description of one of the assailants on the night of Muro's murder. Cruz's description of the offense was similar to the evidence adduced concerning each of the robberies with which defendant was charged: namely, that an assailant approached brandishing a black firearm and demanding money.

Jurors were also able to credit Amor's testimony that around the time Cruz was robbed, defendant and Miller exited her vehicle, which was parked at the Santa Ana Zoo across the street from the apartment complex where Cruz lived, and they walked toward Cruz's apartment building. She told police she observed defendant and Miller return a short while later carrying a wallet. About four hours after that, the vehicle was

searched, and Cruz's wallet was recovered from under the driver's seat.

Viewing all of this evidence in the light most favorable to the judgment, see *People v. Rivera, supra*, 7 Cal.5th at pages 323–324, it supports the jury's finding that defendant, perhaps along with Miller, entered the apartment complex, robbed Cruz, and returned to the car with his wallet. We cannot, as a matter of law, say that the jury lacked sufficient evidence to convict defendant of this crime.

### 3. *Evidence Defendant Personally Discharged a Firearm*

Defendant claims insufficient evidence supported the jury's findings that he personally discharged a firearm within the meaning of section 12022.53, subdivision (d)[14] in the Muro robbery and murder. We disagree.

We review the record in the light most favorable to the judgment, evaluating " ' " ' "whether it discloses . . . evidence which is reasonable, credible, and of solid value[,] such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." ' " ' " (*People v. Rivera, supra*, 7 Cal.5th at p. 323.) " 'We review the sufficiency of the evidence to support an enhancement using the same standard we apply to a conviction.' " (*Id*. at p. 331.)

---

[14] Section 12022.53, subdivision (d) states in relevant part: "any person who, in the commission of a felony specified in subdivision (a), Section 246, or subdivision (c) or (d) of Section 26100 [murder is enumerated in subdivision (a)], personally and intentionally discharges a firearm and proximately causes great bodily injury, as defined in Section 12022.7, or death, to any person other than an accomplice, shall be punished . . . ."

Defendant argues the jury's true finding is not supported by sufficient evidence because Stukkie failed to identify him as the shooter and failed to identify his clothing. He also argues that Espinoza's and Amor's testimony is unreliable because they were biased in favor of the prosecution. Finally, he argues that a latent palm print found on the trunk of a nearby car does not suggest he was the shooter because the print might not have been fresh. None of these arguments are meritorious. Once again, defendant has merely pointed to other theoretical evidence that would have made the prosecution's case stronger, and to inferences (that Espinoza and Amor lied and the palm print could have been old) that the jury could have, but was not compelled, to draw. This does not establish a valid insufficiency of the evidence claim.

To the contrary: Ample evidence was presented placing defendant at the scene of the shooting and pointing to him as the shooter. Espinoza and Amor, whom the jury could have believed despite defendant's claim of bias, testified that defendant was in the area where Muro was shot around the time he was shot. Defendant's location, and Espinoza's and Amor's testimony regarding his location, was corroborated by the presence of defendant's palm print on a car parked near where Muro was murdered, and the jury could have rejected the notion that defendant had somehow put his hand on that car at some earlier time. Espinoza also testified that, after the shooting occurred, Gonzalez and Miller ran back to Espinoza's car without defendant, shouting "let's go; let's go; start the car." The group then left the parking lot and picked up defendant on the east side of Elk Lane next to the Santa Ana Zoo fence, with Gonzalez and Miller yelling "fucking Peewee; fucking Peewee"

while hitting the backs of the seats in front of them. When police searched that area the next day, they found Muro's wallet.

Once defendant was in the car, Gonzalez and Miller told defendant he would "regret it for the rest of his life," he was "going to get taxed for that," and that they "should kick his ass for this." While in the car, defendant told the group he shot Muro because Muro "was going to fight back," "he got up," and "he came back at" defendant. Defendant was arrested the next morning, and the firearm used in the Muro shooting was found in his apartment.

Viewed in the light most favorable to the verdict, the evidence described above is sufficient for a jury to have concluded defendant personally discharged a firearm during Muro's robbery and murder.

## B. Asserted Instructional Errors

Defendant mounts numerous challenges to the trial court's guilt phase instructions. We assume for the sake of argument that all claims are cognizable to the extent defendant's substantial rights could have been affected. (§ 1259.) Regardless, they are without merit.

### 1. *Failure to Give Voluntary Manslaughter Instruction*

Defendant contends the trial court reversibly erred by failing to sua sponte instruct the jury on voluntary manslaughter, the lesser included offense of murder, because there existed sufficient evidence that he committed the homicide in the heat of passion. This claim lacks merit.

### a. Background

Martinez purportedly witnessed an altercation on April 1, 1999, that resulted in Muro's death: As he slowly drove past his apartment complex, he saw four people struggling, although several parked cars partially blocked his view. Martinez could not see the faces of the people engaged in the fight, and he was only able to tell they wore loose clothing. As he continued to drive down the street, Martinez noticed a fifth person cross the street and walk toward the fight. Martinez drove away from the fight to a store, from which he called the police to report the incident. While at the store, he could no longer see the fight and he did not hear any gunshots. When he returned to the scene of the fight, Martinez saw someone lying on the ground, and he believed that person to be one of the people who had been involved in the fight.

The court held a colloquy with the parties regarding jury instructions on theories of murder, during which the parties agreed the jury should be instructed — and it was — on murder (CALJIC No. 8.10), first degree premeditated murder (CALJIC No. 8.20), first degree felony murder (CALJIC No. 8.21), second degree murder (CALJIC Nos. 17.10, 8.30, 8.31), and robbery-murder special circumstances (CALJIC No. 8.81.17). The court asked defense counsel whether he had "any theory at all . . . for a manslaughter" instruction. The court added, "I couldn't think of any. I looked back through some cases. I couldn't find any. You can't either?" Defendant's attorney replied, "No." No manslaughter instruction was given.

### b. Discussion

Defendant claims that because substantial evidence supported an instruction on the lesser included offense of

voluntary manslaughter, the trial court erred by failing to provide that instruction to the jury sua sponte. A trial court must instruct a jury on lesser included offenses when the evidence raises questions regarding whether every element of a charged offense is present. (*People v. Sattiewhite* (2014) 59 Cal.4th 446, 477.) No instruction on lesser included offenses is required if there is no evidence that there was any offense less than that charged. Instructing the jury on a lesser included offense is not required when the evidence supporting such an instruction is weak, but " ' "whenever evidence that the defendant is guilty only of the lesser offense is 'substantial enough to merit consideration' by the jury," ' " such an instruction is required. (*Ibid*.) Whether the evidence is substantial is tested by considering whether a jury would conclude the lesser but not the greater offense was committed. (*Ibid*.)

Voluntary manslaughter, a lesser included offense of murder, is defined as the unlawful killing of a human being without malice. (§ 192; see *People v. Rios* (2000) 23 Cal.4th 450, 465 [acknowledging the judicially developed theory not enumerated in § 192 that "manslaughter is a killing which, though criminal, *lacks the murder element of malice*"].) Manslaughter instructions are warranted when substantial evidence exists to support a jury's determination that the killing was committed in the heat of passion and thus does not constitute a first degree murder. (See *People v. Smith* (2018) 4 Cal.5th 1134, 1164–1167.)

"Heat of passion is a mental state that precludes the formation of malice and reduces an unlawful killing from murder to manslaughter." (*People v. Beltran* (2013) 56 Cal.4th 935, 942.) Heat of passion killing is distinct from malice murder

because thought in some form is necessary "to form either an intent to kill or a conscious disregard for human life." (*Ibid*.) A heat of passion killing, we have explained, is one caused by an unconsidered reaction to provocation rather than the result of rational thought. If reason " ' "was obscured or disturbed by passion" ' " to so great a degree that an ordinary person would " ' "act rashly and without deliberation and reflection," ' " we have concluded that killing arose from " ' "passion rather than from judgment." ' " (*Ibid*.)

Defendant argues substantial evidence existed to demonstrate that he killed in the heat of passion, requiring that the court give a voluntary manslaughter instruction. Defendant claims that Martinez's observation of a "struggl[e]" between, presumably, defendant and the victim, sufficed to demonstrate that passion. This contention falls short of the mark. Martinez was unable to see more than outlines of individuals involved in the fight; he testified that several parked cars blocked his view of the altercation. Martinez had no information regarding what precipitated the struggle, who might have been the aggressor, or how violent the altercation became. (See, e.g., *People v. Enraca* (2012) 53 Cal.4th 735, 760 ["[p]redictable and reasonable conduct by a victim resisting felonious assault is not sufficient provocation to merit an instruction on voluntary manslaughter"].) Martinez's scant evidence regarding the struggle would not permit a reasonable jury to conclude that defendant acted under the influence of a strong passion inflamed by the victim, nor that this was the sort of fight that would lead an ordinary person to act rashly and without deliberation and reflection, and from a heat of passion rather from judgment. Accordingly, defendant's claim that the trial

court erred by failing to sua sponte instruct the jury on voluntary manslaughter is without merit.

## 2. *Constitutionality of CALJIC No. 2.51*

Defendant reiterates two often repeated challenges to CALJIC No. 2.51 regarding evidence of motive:[15] that the instruction permitted the jury to determine guilt based on motive alone in violation of due process, and that it impermissibly shifted the burden of proof to the defense to prove innocence. To the extent defendant's challenges to CALJIC No. 2.51 are not forfeited for failing to object to the instruction or request it be modified, there was no error. "This court has previously rejected the argument that it is necessary to instruct the jury that motive alone is insufficient to establish guilt." (*People v. Westerfield* (2019) 6 Cal.5th 632, 711.) Likewise, "as we have in the past," we reject the argument that "CALJIC No. 2.51 lessens the prosecution's burden of proof." (*People v. Tate* (2010) 49 Cal.4th 635, 699.)

## 3. *Failure to Give a Unanimity Instruction on Theory of First Degree Murder*

Defendant argues the trial court erred in failing to instruct the jury that "it had to agree unanimously whether [he] committed malice murder or felony-murder." He acknowledges the many decisions of this court rejecting the claim and urges us

---

[15] The trial court instructed the jury that "[m]otive is not an element of the crimes charged and need not be shown. However, you may consider motive or lack of motive as a circumstance in this case. Presence of motive may tend to establish guilt. Absence of motive may tend to establish innocence. You will therefore give its presence or absence, as the case may be, the weight to which you find it to be entitled."

to reconsider them, but he provides no basis to do so. As we explained in *People v. Sattiewhite*, the two types of murder at issue in that case — premeditated murder and felony murder — were not different crimes but were instead alternate mechanisms of determining liability. (*People v. Sattiewhite*, *supra*, 59 Cal.4th at p. 479; see also *People v. Milan* (1973) 9 Cal.3d 185, 194–195.) In *People v. Milan*, we noted a similar rule had been applied in burglary cases with respect to the underlying felonious theory of entry (see *People v. Failla* (1966) 64 Cal.2d 560, 569) and theft cases with respect to the type of taking, whether by false pretenses, larceny by trick, embezzlement, or otherwise (see *People v. Nor Woods* (1951) 37 Cal.2d 584, 586). We adhere to our previously expressed view. "[A]s long as each juror is convinced beyond a reasonable doubt that defendant is guilty of murder as that offense is defined by statute, it need not decide unanimously by which theory he is guilty." (*People v. Santamaria* (1994) 8 Cal.4th 903, 918; see also *People v. Potts* (2019) 6 Cal.5th 1012, 1048.)

## IV.  PENALTY PHASE AND SENTENCING ISSUES

### A. Instructional Error Pertaining to CALJIC No. 8.85

Defendant contends that CALJIC No. 8.85, the standard instruction identifying the aggravating and mitigating circumstances, is "constitutionally flawed." The defect, according to defendant, is that the instruction's "prefatory" use of the phrase "whether or not" in conjunction with certain factors caused the jury confusion as to which factors were aggravating, mitigating, or either — depending on the jury's view of the evidence. That is, the instruction's language

permitted the jury to consider factors in mitigation as aggravating.

As defendant acknowledges, " '[t]he trial court had no obligation to advise the jury which sentencing factors were aggravating, which were mitigating, or which could be either aggravating or mitigating depending on the jury's appraisal of the evidence.' [Citation.] 'The phrase "whether or not" in section 190.3, factors (d)–(h) and (j) does not unconstitutionally suggest that the absence of a mitigating factor is to be considered as an aggravating circumstance.' " (*People v. Miracle* (2018) 6 Cal.5th 318, 354.) We decline to reconsider this precedent.

## B. Claimed Violation of the Vienna Convention

When law enforcement officials questioned Vargas, they failed to inform him of his right to contact the Mexican consulate and failed to notify the consulate of his arrest until after the jury returned a death verdict. As a result, defendant claims, law enforcement officials violated his rights under the Vienna Convention on Consular Relations, April 24, 1963, 21 U.S.T. 77, T.I.A.S. No. 6820 (Vienna Convention). After the verdict, defendant unsuccessfully moved for a new trial. Defendant conceded during oral argument that a showing of prejudice is required to prevail on a Vienna Convention claim, and he asserts he suffered prejudice.[16] We conclude defendant suffered

---

[16] Defendant argued initially that prejudice could not be determined on the appellate record and raised the issue to preserve it for habeas corpus review. (See *People v. Mendoza* (2016) 62 Cal.4th 856, 917; *People v. Mendoza* (2007) 42 Cal.4th 686, 710.) The Attorney General argued defendant would be barred from habeas corpus relief because he had an opportunity to present evidence before the trial court that he suffered prejudice due to a violation of the Vienna Convention when he

no prejudice, and although law enforcement officials involved in questioning Vargas technically violated the Vienna Convention, reversal is not warranted.

### *1. Background*

Before he was sentenced, defendant filed a motion for new trial, claiming he was denied due process of law when law enforcement officials failed to follow the Vienna Convention and notify consular officials of his arrest. Mexican consular officials did not become aware of defendant's case until after defendant was convicted and the jury recommended a death sentence. Defendant argues that had the Mexican consulate been notified of his arrest, a consular official would have advised him, consistent with *Miranda v. Arizona* (1966) 384 U.S. 436 (*Miranda*), to exercise his Fifth Amendment right to silence. Instead, defendant spoke with police. Although he did not incriminate himself, he claims to have made statements he alleges were factually inconsistent with evidence adduced at trial. Had he remained silent, defendant argues, he would have felt more free to testify at his trial. But because his statements to police contained self-described factual inconsistencies, any testimony he might have given would have been subject to impeachment.

In support of his motion for new trial, defendant presented evidence that he was a Mexican national, and presented testimony from two witnesses regarding the benefits

---

filed a motion for new trial. The trial court denied that motion, however, finding a violation of the Vienna Convention occurred, but that defendant suffered no prejudice. The matter has now been fully briefed for appellate consideration.

preconviction consular assistance might have provided to him.[17] Defendant argued that he was not notified upon arrest of his right to speak with a consular official. Indeed, no consular official ever contacted defendant, although, as defense counsel argued, "almost 12 hours after [defendant] was arrested, an Immigration and Naturalization Service official showed up . . . to see whether or not he was deportable." After determining defendant was a "lawful, permanent resident," Diane Booker, the immigration agent who interviewed defendant, advised him of his rights to counsel and consular services in connection with his immigration proceedings. Booker testified that she did not routinely record whether consular services were requested by arrestees, and that Mexico's consulate was not one Immigration and Naturalization Service (I.N.S.) officials were under an obligation to contact.

The prosecution maintained that defendant made no offer of proof regarding what specific evidence would have been presented in the guilt or penalty phases had consular assistance been provided. Despite the "technical violation" of the Vienna Convention, the prosecutor argued defendant would not have sought consular assistance because he did not contact an attorney even after he was advised by the I.N.S. to do so.

---

[17] Specifically, defendant relied on the testimony of Sandra Babcock, an attorney enlisted by the Mexican government to assist defendant, who testified that she was the director of a legal assistance program for Mexican nationals facing the death penalty. Babcock suggested that defendant retain the services of a bilingual mental health expert. That expert, Dr. Ricardo Weinstein, also testified on defendant's behalf, criticizing a great deal of the psychological and social evidence that was presented at trial.

After hearing argument, the court concluded that the notice of rights provided by the I.N.S. official — i.e., handing defendant "a copy of the immigration rights form" — did not "satisf[y] the requirements of the Vienna Convention, but it did put [defendant] on notice that the Mexican Consulate was available." The trial court ruled that "there was a technical violation of the Vienna Convention," noting: "There are no remedies set out in the Treaty." Sandra Babcock, a witness for defendant in support of his motion for new trial, urged the court to return defendant "to the status he was in at the time of the violation, meaning immediately post arrest," a remedy that was, in the court's view, "unreasonable" and "not based upon law. [¶] If there is a violation of the statute, due process requires prejudice before any remedy should be imposed." The court ruled that it was defendant's burden to demonstrate that prejudice, and because he failed to meet his burden no remedy was warranted.

### 2. Discussion

The Vienna Convention requires that law enforcement officers convey to arrested foreign nationals, "without delay," that they have the right to have their consulate notified of their arrest. (Vienna Convention, *supra*, art. 36, par. 1(b), at p. 101 (Article 36); see § 834c, subd. (b).)

Should the arrestee request consular notification, the law enforcement officer must promptly inform the consulate of the arrest. (Article 36, at p. 101.) These requirements of the Vienna Convention were enacted as state statutory law in 2000, but the California Legislature did not specify a remedy for their violation. (§ 834c; see Comment, *A Proposal for U.S. Implementation of the Vienna Convention's Consular*

*Notification Requirement* (2013) 60 UCLA L.Rev. 1324, 1366.) Section 834c provides that any " 'known or suspected foreign national' " must be informed of the right to consular notification within two hours of arrest, booking, or detention. (*People v. Leon* (2020) 8 Cal.5th 831, 845 (*Leon*), quoting § 834c, subd. (a)(1).) Although defendant argues his rights under that statute were violated, we conclude no violation of section 834c occurred, since it was not effective until after defendant's arrest.

As we have in other cases, we assume here that Article 36 of the Vienna Convention created rights enforceable by individuals. (*People v. Mendoza*, *supra*, 62 Cal.4th at p. 917.) A defendant is entitled to relief under the Vienna Convention if the defendant can show that a violation occurred, and that the violation resulted in prejudice. (See *People v. Mendoza*, *supra*, 42 Cal.4th at p. 711; see also *Breard v. Greene* (1998) 523 U.S. 371, 377.) Although Article 36 " 'secures only a right of foreign nationals to have their consulate *informed* of their arrest or detention—not to have their consulate intervene, or to have law enforcement authorities cease their investigation pending any such notice or intervention' " (*Leon*, *supra*, 8 Cal.5th at p. 846), consular notification may facilitate a defendant's access to assistance, advice, and legal services. If a defendant is unable to make "some showing that the violation had an effect on the trial," the U.S. Supreme Court has explained that even with a "properly raised and proved" Vienna Convention claim, "it is extremely doubtful that [a] violation should result in the overturning of a final judgment of conviction." (*Breard v. Greene*, *supra*, 523 U.S. at p. 377.) " 'In most circumstances, there is likely to be little connection between an Article 36 violation and evidence or statements obtained by police.' (*Sanchez-Llamas v. Oregon* (2006) 548 U.S. 331, 349, [165

L.Ed.2d 557, 126 S.Ct. 2669] (*Sanchez-Llamas*).) Accordingly, the 'failure to notify a suspect of his or her consular rights does not, in itself, render a confession inadmissible' under Article 36. (*People v. Enraca*[, *supra*,] 53 Cal.4th [at p. ]756 [137 Cal.Rptr.3d 117, 269 P.3d 543] (*Enraca*); see *Sanchez-Llamas*, at p. 349.)" (*Leon*, *supra*, at p. 846.)

A consular notification claim may be raised as part of a broader challenge to a confession's voluntariness. (*Sanchez-Llamas v. Oregon, supra*, 548 U.S. at p. 350.) Defendant argues that had he received consular assistance, he would not have waived his right to silence under *Miranda*. Yet defendant did not confess; he made statements to police following a *Miranda* waiver that he acknowledges were not incriminating. He contends that he did not testify because those statements contained inconsistencies with facts developed at trial and could have been used for impeachment purposes. In *Leon*, the defendant did not contend "his statements to police were involuntary;" but instead "assert[ed] the lack of consular notice is a circumstance that rendered his *Miranda* waiver invalid." (*Leon, supra,* 8 Cal.5th at p. 846.) We concluded the defendant's argument lacked merit because he did not establish a link between his confession and lack of consular notice. (*Ibid.*)

The link between defendant's statements to law enforcement and the lack of consular notice is even more tenuous here. Defendant's Article 36 claim fails for that reason. Defendant's argument — that he might have testified at trial had a consular official advised him to remain silent when questioned by the police — is far too speculative given the record in this case. (See *Leon*, at p. 846; see also *Breard v. Greene, supra*, 523 U.S. at p. 377 [speculative Vienna Convention claim rejected where it could not "arguably" be shown that the treaty's

"violation should result in the overturning of a final judgment of conviction without some showing that the violation had an effect on the trial"].) Defendant made no incriminating statements but argues his "uncounseled" "misstatements" to law enforcement rendered testifying an impossibility. That is, he claims that while the consular notification failure did not cause him to waive his *Miranda* rights, the notification failure nonetheless left him unable to understand and exercise his right to silence.

We considered and rejected this argument in *Leon*. (*Leon*, *supra*, 8 Cal.5th at p. 846.) In that case, the defendant argued that a consular official would have provided a more " 'full[] and careful[]' " recitation of *Miranda* advisements than those delivered by an officer and he would have been better situated to heed the advice of a consular official due to his "poor[] acculturat[ion] and inexperience[]." (*Ibid*.) The defendant in *Leon* alleged that a consular official would have advised him to exercise his right to silence under *Miranda*. In order to find any resulting statement subject to suppression, we concluded in *Leon* that there must be a link between the treaty violation and statement made to law enforcement. (*Leon*, at p. 846.) We did not find the situation in *Leon* precluded defendant from exercising the right to silence or compelled his confession to law enforcement officials, and we likewise find no link here. (*Ibid*.)

Defendant also argues that, without the Vienna Convention violation, he would have availed himself of consular resources in the form of mitigation specialists and other officials who would have dissuaded prosecutors from seeking the death penalty, and he did not obtain similar assistance elsewhere. Specifically, defendant claims the Mexican consulate would have provided him with a bilingual mitigation specialist

familiar with Mexican culture, an addiction specialist, a bilingual psychologist familiar with standardized testing biases, and a neuropsychologist. He argues the notification failure also prejudicially deprived him of the financial benefit associated with the preparation and presentation of his defense.

This argument fails, too. To the extent this claim asserts prejudice based on material outside the record, it should be raised in a petition for habeas corpus, as defendant notes. (*People v. Mendoza, supra*, 62 Cal.4th at p. 918; see *People v. Mendoza, supra*, 42 Cal.4th at p. 710.) To the extent the claim is based on evidence presented at his motion for new trial, we conclude the trial court did not err. In his motion for a new trial, defendant presented evidence from Dr. Ricardo Weinstein, one of the experts that attorney-witness Babcock had recommended. Weinstein testified that defendant's family was dysfunctional, that defendant suffered a history of trauma, and that defendant was addicted to drugs and alcohol; Weinstein also opined that the disparity between defendant's verbal and performance ability, as well as his cultural background, rendered the Minnesota Multiphasic Personality Inventory an invalid test. Defendant argues that this evidence would have been available had the consulate been notified, because the consulate would have provided him with a host of trial specialists.

Even without consular assistance, defendant managed to present a great deal of evidence during the guilt and penalty phases of his trial. (See *ante*, at pp. 9-13, 15-19.) Much of this evidence concerned topics Weinstein proposed to raise, including defendant's drug and alcohol dependency and his family dysfunction. Defendant argues it is "highly likely the outcome of [his] trial would have been different" had consular assistance been available because of "Mexico's unequaled track

record in defending its nationals." In particular, defendant explains that the Mexican Capital Legal Assistance Program experienced a great deal of success in defending its clients, although he does not assert whether or to what extent he was eligible for their services. He also fails to articulate what evidence, specifically, the program would have assisted him with developing or presenting, and how such evidence would have affected the outcome of his trial. Despite defendant's lack of consular assistance, he was able to present evidence in mitigation concerning his family history and cognitive abilities. Defendant is unable to demonstrate he suffered prejudice because he has neither shown that the Mexican consulate would have provided him with resources that were not otherwise accessible, nor that those resources would have affected the outcome of his trial. (See *People v. Mendoza*, *supra*, 42 Cal.4th at p. 711.)

Though no prejudice resulted from the consular notification failure here, we are mindful that "the United States Supreme Court has articulated several possible remedies for a consular notification violation." (*Leon*, *supra*, 8 Cal.5th at p. 856 (conc. opn. of Cuéllar, J.).) Those remedies can range from "mak[ing] accommodations to secure for the defendant the benefits of consular assistance" to suppressing a confession made to law enforcement in the absence of such assistance. (*Ibid.*) Too often ignored, the nation's Article 36 obligations remain enormously important. Where courts become "concerned [that a] consular notification failure may be part of a scheme to deprive the national of any meaningful choice . . . , a remedy for the consular notification violation is surely warranted." (*Leon*, at p. 857 (conc. opn. of Cuéllar, J.).) That a

failure of consular notification occurred here is beyond dispute, but on the record before us we find no prejudice resulted from it.

## C. Denial of Application to Modify the Jury's Verdict

Defendant contends the trial court improperly denied his automatic motion to modify the jury's death verdict and seeks either a reduction of his sentence to life without the possibility of parole or, in the alternative, remand for a new sentence modification hearing.  (§ 190.4, subd. (e).)[18]  Defendant appears to have forfeited this claim by failing to raise it at trial (*People v. Hartsch* (2010) 49 Cal.4th 472, 514); we also conclude neither form of relief sought is warranted.

---

[18]     In its entirety, section 190.4, subdivision (e) provides:  "In every case in which the trier of fact has returned a verdict or finding imposing the death penalty, the defendant shall be deemed to have made an application for modification of such verdict or finding pursuant to Subdivision 7 of Section 11.  In ruling on the application, the judge shall review the evidence, consider, take into account, and be guided by the aggravating and mitigating circumstances referred to in Section 190.3, and shall make a determination as to whether the jury's findings and verdicts that the aggravating circumstances outweigh the mitigating circumstances are contrary to law or the evidence presented.  The judge shall state on the record the reasons for his findings.  [¶]  The judge shall set forth the reasons for his ruling on the application and direct that they be entered on the Clerk's minutes.  The denial of the modification of the death penalty verdict pursuant to subdivision (7) of Section 1181 shall be reviewed on the defendant's automatic appeal pursuant to subdivision (b) of Section 1239.  The granting of the application shall be reviewed on the People's appeal pursuant to paragraph (6)."

## 1. *Background*

Following his death sentence, defendant filed a motion under section 190.4, subdivision (e), seeking a reduction of his sentence to life without parole. The People did not file a written opposition, but noted their position at the hearing on the motion "that the facts that the jury was presented [*sic*] did support the verdict and the recommendation of death." The trial court held a thorough hearing on the motion, explaining that the burden was on the court to "make findings" on the evidence, which the court noted it had done contemporaneously, "when the facts were still fresh." The trial court subsequently denied the motion, extensively reviewing and discussing the factors in aggravation and mitigation prior to reaching its decision.

The trial court concluded that Muro's murder was "senseless," and done simply to avoid Muro's ability to identify defendant. The court found aggravating that defendant fired a second shot when a single shot could have accomplished his goal and noted that just days before the crime defendant and his friends were involved in multiple armed robberies. The court also noted the existence of mitigating factors, including defendant's age and lack of criminal background. Throughout the hearing the court offered the parties an opportunity to be heard, although defense counsel declined on numerous occasions.

After denying the motion and stating its findings on the record, the court directed that the reasons for its ruling "be entered on the clerk's minutes" consistent with section 190.4, subdivision (e), which directive was followed in an October 11, 2001 minute order.

### 2. *Discussion*

Defendant claims the trial court erred in violation of section 190.4, subdivision (e) by not properly reweighing the aggravating and mitigating factors before denying the automatic motion under that statute, and by failing to set forth the reasons for its denial of the motion in the clerk's minutes as the statute requires. The record reveals the invalidity of these claims.

As the statute makes clear, "the trial court must set forth reasons [for denying an application to modify a sentence] on the record and direct that they be entered in the clerk's minutes. [Citation.] On appeal, we review the trial court's ruling independently, but it is not our role to redetermine the penalty in the first instance." (*People v. Gamache* (2010) 48 Cal.4th 347, 403.) The trial court is not required to "recount 'every detail' supporting its determination." (*People v. Lewis and Oliver* (2006) 39 Cal.4th 970, 1064; see *People v. Landry* (2016) 2 Cal.5th 52, 124.) " 'Where the record shows the trial court properly performed its duty under section 190.4, subdivision (e), to conduct an independent reweighing of the aggravating and mitigating evidence, the court's ruling will be upheld.' " (*Landry*, at p. 124.)

The record here demonstrates the trial court appropriately reweighed the mitigating and aggravating evidence. The trial court discussed, at length, the various factors supporting the jury's verdict. The trial court found compelling that the Muro robbery and murder were "senseless," and that defendant shot the victim twice when one bullet would have sufficed. The court noted the presence of other aggravating factors, including the armed robberies defendant, Miller, and Gonzalez committed in

the days preceding the murder. In mitigation, the trial court noted defendant's relative youth and his family background. The trial court also asked whether counsel wished to be heard as to each factor; defense counsel generally "submit[ted]" argument. Defendant's assertion that the trial court failed to properly reweigh the circumstances in aggravation and mitigation is not borne out by the record — the mere fact that the court gave more significant weight to certain facts it found aggravating than those that were mitigating does not make its decision improper.

The record also does not support defendant's assertion that the court failed to record its findings in the clerk's record. The minute order, dated October 11, 2001, contains a near verbatim recitation of the court's recounting of the aggravating and mitigating circumstances. Section 190.4, subdivision (e) provides that "[t]he judge shall set forth the reasons for his ruling on the application and direct that they be entered on the Clerk's minutes." The court did precisely this, ordering: "The court's reasons for these findings will be — or shall be entered on the clerk's minutes." The minute order reflects that the findings were entered. Defendant's claim that "[t]he minutes only reiterated [the] factors in aggravation and mitigation but failed to state why the aggravating factors substantially outweighed the factors in mitigation" is derivative of the claim rejected above. Accordingly, there was no error in the court's denial of the motion to modify the verdict.

## V. OTHER ISSUES

### A. General Challenges to California's Death Penalty Law

Defendant raises several objections to the constitutionality of California's death penalty scheme. We decline to reconsider our existing precedent and reject these objections, on the merits, as follows:

The special circumstances set forth in section 190.2 that render a defendant eligible "for the death penalty [citation] are not unconstitutionally overbroad." (*People v. Eubanks* (2011) 53 Cal.4th 110, 153; see also *People v. Bell* (2019) 7 Cal.5th 70, 130 [" 'Section 190.2 adequately narrows the category of death-eligible defendants and is not impermissibly overbroad under the requirements of the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution' "].) Further, there are not so many special circumstances enumerated that they "fail to perform the constitutionally required narrowing function." (*People v. Williams* (2010) 49 Cal.4th 405, 469.)

Allowing the jury to consider the "circumstances of the crime" under section 190.3, factor (a) does not result in the arbitrary and capricious imposition of the death penalty. (*People v. Peoples* (2016) 62 Cal.4th 718, 806.)

This court has repeatedly rejected the argument that the adjectives "extreme" and "substantial," as they relate to factors in mitigation, "impose an unconstitutional threshold requirement before the jury may consider mitigating evidence." (*People v. Landry, supra,* 2 Cal.5th at p. 122.) Likewise, the phrase "so substantial" in the instruction on comparing aggravating and mitigating factors does not *yield unlimited*

*discretion in the sentencing process, nor does it raise such a prospect of an arbitrary or capricious sentencing* outcome that it would risk the instruction's constitutionality. (*Id.* at p. 123.)

The jury's instruction to consider whether or not some factors in mitigation " ' " ' " ' "were present did not impermissibly invite the jury to aggravate the sentence upon the basis of nonexistent or irrational aggravating factors." ' " ' " ' " (*Erskine, supra,* 7 Cal.5th at p. 304.) The federal Constitution does not require that a jury be instructed on whether a section 190.3 factor is aggravating or mitigating, or whether the factor could be either of those. (*Ibid.*)

We have not held the Sixth and Fourteenth Amendments to "require a jury instruction regarding the burden of proof in capital sentencing." (*People v. Capers* (2019) 7 Cal.5th 989, 1015.) The only burden of proof consideration made during the penalty phase concerns aggravating evidence under section 190.3, factors (b) and (c), of other crimes and prior convictions, respectively. Decisions of the United States Supreme Court interpreting the Sixth Amendment's jury trial guarantee do not alter the basis for our conclusion. (*People v. Debose* (2014) 59 Cal.4th 177, 213.)

Similarly unavailing is defendant's contention that a jury is required to find beyond a reasonable doubt that the appropriate penalty is death, that aggravating factors outweigh those in mitigation, or that all aggravating factors have been proved beyond a reasonable doubt. (*People v. Mendez* (2019) 7 Cal.5th 680, 717.) There is no requirement that the jury make written findings of aggravating and mitigating factors. (*Ibid.*) And juries are not subject to a unanimity requirement when

64

they are deciding whether a particular factor in aggravation is present. (*Ibid.*)

Nor is there support for the conclusion that existing international law prohibits imposition of the death penalty in the United States. (*People v. Capers, supra,* 7 Cal.5th at p. 1017.) When the United States signed the International Covenant on Civil and Political Rights, it expressly reserved the right to impose capital punishment subject to certain constraints not applicable here. (*Ibid.*)

The federal and state Constitutions, and the state's death penalty laws, do not require intercase proportionality review. (*People v. Capers, supra,* 7 Cal.5th at pp. 1016–1017.)

A delay between the time a defendant is sentenced and executed does not violate the California or federal Constitutions. (*People v. Masters* (2016) 62 Cal.4th 1019, 1078.)

## B. Cumulative Prejudice

Defendant contends the combined guilt and penalty phase errors require reversal of his conviction and death sentence, even if the errors are not prejudicial when considered individually. We have found no error, so no prejudice can accumulate.

## VI. DISPOSITION

We affirm the judgment.

**CUÉLLAR, J.**

**We Concur:**

**CANTIL-SAKAUYE, C. J.**
**CHIN, J.**
**CORRIGAN, J.**
**LIU, J.**
**KRUGER, J.**
**GROBAN, J.**

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion** People v. Vargas

_____

**Unpublished Opinion**
**Original Appeal** XXX
**Original Proceeding**
**Review Granted**
**Rehearing Granted**

_____

**Opinion No.** S101247
**Date Filed:** July 13, 2020

_____

**Court:** Superior
**County:** Orange
**Judge:** John Ryan

_____

**Counsel:**

Russell S. Babcock, under appointment by the Supreme Court, for Defendant and Appellant.

Kamala D. Harris and Xavier Becerra, Attorneys General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Robin Urbanski, Michael T. Murphy, Holly D. Wilkens and Kristen Kinnaird Chenelia, Deputy Attorneys General, for Plaintiff and Respondent.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Russell S. Babcock
Law Offices of Russell S. Babcock
1901 First Avenue, First Floor
San Diego, CA 92101
(619) 531-0887

Michael T. Murphy
Deputy Attorney General
600 West Broadway, Suite 1800
San Diego, CA 92186-5266
(619) 738-9211