Filed 12/18/23  P. v. Muhammad CA2/3

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>ABDUL QADIR MUHAMMAD,<br><br>    Defendant and Appellant. | B327083<br><br>(Los Angeles County<br>Super. Ct. No. NA118377) |

        APPEAL from a judgment of the Superior Court of Los Angeles County, Laura L. Laesecke, Judge.  Affirmed.
        Lenore De Vita, under appointment by the Court of Appeal, for Defendant and Appellant.
        Rob Bonta, Attorney General, Lance Winters, Assistant Attorney General, Susan Pithey, Senior Assistant Attorney General, Scott Taryle and Rene Judkiewicz, Deputy Attorneys General, for Plaintiff and Respondent.

_____

A jury found Abdul Qadir Muhammad guilty of making criminal threats in violation of Penal Code section 422, subdivision (a),[1] and second degree burglary in violation of section 459. Muhammad appeals, contending the evidence was insufficient to support both convictions. We affirm the judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

In the early fall of 2021, Muhammad and his family moved into a homeless shelter in San Pedro, California. The shelter contained 22 studio apartment units. Only families with minor children were eligible to stay at the shelter. Residents were required to comply with shelter rules, which prohibited weapons and pets that were not emotional support animals. Families were permitted to stay at the shelter for up to 90 days. During that time, they were required to participate in a case plan designed to help them secure permanent housing.

On October 18, 2021, Muhammad was asked to leave the shelter. Muhammad's children and their mother had moved out, so he was no longer eligible to stay. He had violated shelter policies by bringing in swords, missing required bed nights, acting aggressively towards staff, and failing to follow his family's case plan. He also brought two pit bulls into the shelter without permission. Two witnesses described the dogs as "aggressive."

When asked to leave, Muhammad became angry and defiant. Either Iran Guzman, the shelter's director of housing, or Michael Beers, the shelter's manager, changed the locks, but

_____

[1]     All further undesignated statutory references are to the Penal Code.

Muhammad returned with a locksmith who removed those locks and installed new ones for Muhammad.  The police declined to respond to the shelter's call for assistance, explaining that any eviction actions needed to proceed through the court system.

On the evening of November 3, 2021, Guzman saw Muhammad in the children's area of the shelter with his dogs. Guzman told Muhammad the shelter was only for families, but that there were other options for him.  Muhammad responded that he had a right to be there because it was a homeless shelter. He also told Guzman, " 'You see all of these homeless people on the corner[?]  They need to be in here.' "

Guzman returned to her office, where, through the window, she saw Muhammad trying to open the door and window of one of the apartments.  Realizing that Muhammad planned to enter units, perhaps to bring in other people, she ran to a few units she knew were unlocked and locked them.

Guzman also called Beers and told him Muhammad was trying to open up units to bring in other people to stay in them. Beers immediately checked the shelter's security camera footage on his phone and saw Muhammad trying doors and windows on several units, and successfully opening three of them.  He also saw Guzman relock those units.  Beers watched Muhammad leave the shelter and return with Lee, a man who typically slept on the street outside the shelter.  Muhammad and Lee attempted to reopen the doors Muhammad had previously unlocked.

After relocking several doors, Guzman went inside a unit and locked the door.  As she began to close the unit's window, Muhammad ran up with one of his dogs.  From the surveillance video, Beers saw Muhammad and Lee approach the unit. Guzman called Beers and told him Muhammad was outside the

unit. Beers described Guzman as "really scared." He called 911 and drove to the shelter.

Muhammad demanded that Guzman unlock the door, yelling things like, " 'Bitch, unlock the door.' " When Guzman refused and tried to close the window, he warned, " 'Don't you do it, bitch,' " and continued ordering Guzman to unlock the door. Muhammad's statements "escalated." Guzman remembered him saying, " 'I'm going to cut you,' " or " 'I'm going to pop you,' " or "something of that nature." When Muhammad referred to his dog, Guzman feared he was going to let the dog loose on her because it had already "rushed" the door and the windowsill.

During the altercation, Muhammad reached through the window and unlocked the door. Guzman felt trapped and scared because Muhammad was standing at the unit's entrance, with his dog, yelling at her. Muhammad yelled that every unit in the shelter should be full and there were people outside who needed to be in the units. Although Guzman told Muhammad there were other services available to him and other homeless individuals, Muhammad was not receptive and instead continued yelling.

During this interaction, Guzman called 911 twice. Some of Muhammad's statements were recorded in the calls. On the first call, Muhammad swore at Guzman and told her to "get the fuck up out of here." The first call ended abruptly. On the second call, Guzman asked the police to come to the shelter, reporting that Muhammad broke in and was acting "very heightened." Muhammad told Guzman she better "get [her] ass up out of here." Guzman told the dispatcher Muhammad was threatening her. Muhammad said, "If you want to keep it going, I'm going to keep this motherfucker going," and, "You better get off that motherfucking phone." Guzman asked Muhammad, "Are you

threatening me?" He replied, "I ain't threatening your ass. I ain't threatening you." Muhammad later exclaimed, "Fuck, you think I'm scared of your ass? You better think again," and, "Fucking blast on your ass." Guzman felt terrified.

Beers arrived at the shelter. He saw Muhammad and his dog standing in the doorway of the unit. Beers described Muhammad as "quite upset" with Guzman, who was inside. Beers could hear Muhammad and Guzman "going back and forth" in "high-pitched voices." Beers testified Guzman looked "shaken" and "very frightened." Beers feared for Guzman's safety because of Muhammad's large pit bull. Beers observed Muhammad look at Guzman as he said, " 'Don't let me catch you out on the street, you or your family.' "

Muhammad was charged by information with one count of criminal threats (§ 422, subd. (a)), based on his statements to Guzman, and one count of second degree commercial burglary (§ 459). He represented himself at his jury trial and did not testify or offer any evidence. The jury convicted him on both counts. The trial court sentenced him to a term of 16 months on each count, and stayed the sentence on count 2 under section 654.

Muhammad timely appealed.

## DISCUSSION

Muhammad contends his convictions are not supported by sufficient evidence. He asserts his statements to Guzman were not criminal threats but rather angry outbursts stemming from his frustration that he and Lee were not allowed to stay at the shelter. He also argues his burglary conviction must be reversed because there was no evidence he had the intent to commit the underlying felony of criminal threats when he broke into the unit. We conclude substantial evidence supported both convictions.

5

## I.    Standard of Review

To determine whether the evidence is sufficient to sustain a criminal conviction, "we review the entire record in the light most favorable to the judgment of the trial court.  We evaluate whether substantial evidence, defined as reasonable and credible evidence of solid value, has been disclosed, permitting the trier of fact to find guilt beyond a reasonable doubt."  (*People v. Vargas* (2020) 9 Cal.5th 793, 820 (*Vargas*).)  We presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence, and we accept logical inferences the jury might have drawn from circumstantial evidence.  (*People v. Baker* (2021) 10 Cal.5th 1044, 1103.)  We do not reverse unless it appears " ' " 'that upon no hypothesis whatever is there sufficient substantial evidence to support' " the jury's verdict.' [Citation.]" (*People v. Penunuri* (2018) 5 Cal.5th 126, 142.)

## II.    Substantial Evidence Supports Muhammad's Criminal Threats Conviction

To establish the offense of making criminal threats under section 422, subdivision (a), the prosecution must prove: " '(1) that the defendant "willfully threaten[ed] to commit a crime which will result in death or great bodily injury to another person," (2) that the defendant made the threat "with the specific intent that the statement . . . is to be taken as a threat, even if there is no intent of actually carrying it out," (3) that the threat— which may be "made verbally, in writing, or by means of an electronic communication device"—was "on its face and under the circumstances in which it [was] made[ ] . . . so unequivocal, unconditional, immediate, and specific as to convey to the person threatened, a gravity of purpose and an immediate prospect of execution of the threat," (4) that the threat actually caused the

6

person threatened "to be in sustained fear for his or her own safety or for his or her immediate family's safety," and (5) that the threatened person's fear was "reasonabl[e]" under the circumstances.' [Citations.]" (*In re George T.* (2004) 33 Cal.4th 620, 630 (*George T.*).)

Muhammad contends the evidence was insufficient to allow the jury to conclude his statements to Guzman were sufficiently "unequivocal, unconditional, immediate, and specific" to constitute criminal threats. We disagree.

Considering Muhammad's words alone, there is sufficient evidence to support his criminal threats conviction. A threat is an " ' "expression of an intent to inflict evil, injury, or damage on another." ' [Citation.]" (*In re M.S.* (1995) 10 Cal.4th 698, 710.) It is " 'sufficiently specific [to support a criminal threats conviction] where it threatens death or great bodily injury. A threat is not insufficient simply because it does "not communicate a time or precise manner of execution . . . ." [Citation.]' [Citation.]" (*People v. Wilson* (2010) 186 Cal.App.4th 789, 806.) Guzman testified Muhammad said something like, " 'I'm going to cut you' " or " 'I'm going to pop you.' " Muhammad did not present any evidence to the contrary. These uncontroverted statements specifically threatened immediate and unconditional great bodily injury or death.[2] We find them sufficient to constitute criminal threats. (*Id.* at p. 814 [statement that inmate would "find" an

---

[2]     Muhammad argues his threats could not be heard on the 911 calls. However, Guzman testified that the recordings of the 911 calls did not convey everything that happened between her and Muhammad. Before Guzman called 911 the first time, Muhammad was already yelling at her. Moreover, some parts of the 911 calls were unintelligible. The jury was thus permitted to rely on Guzman's uncontroverted testimony.

officer and "blast him" when released from custody in 10 months sufficiently specific criminal threat].)

Even if the words Muhammad used were ambiguous, when taken in context, a reasonable jury could find his statements sufficiently " 'unequivocal, unconditional, immediate, and specific' " to constitute criminal threats. (*George T.*, *supra*, 33 Cal.4th at p. 635.) "A communication that is ambiguous on its face may nonetheless be found to be a criminal threat if the surrounding circumstances clarify the communication's meaning." (*Ibid.*; *In re Ryan D.* (2002) 100 Cal.App.4th 854, 860 (*Ryan D.*) [" '[I]it is the circumstances under which the threat is made that give meaning to the actual words used' "].) "[A]ll of the surrounding circumstances should be taken into account . . . . This includes the defendant's mannerisms, affect, and actions involved in making the threat . . . ." (*People v. Solis* (2001) 90 Cal.App.4th 1002, 1013.)

During the altercation with Guzman, Muhammad stood at the door of the unit and demanded, " 'Bitch, unlock the door.' " He also referred to his dog and allowed it on the windowsill while Guzman was inside. He reached through the window and unlocked the door. He later stood in the doorway with his dog, effectively blocking Guzman's exit. Muhammad yelled "nonstop" at Guzman while the dog barked. Muhammad also told Guzman, "If you want to keep it going, I'm going to keep this motherfucker going," and, "You better get off that motherfucking phone," while she called 911. He told her, " 'Don't let me catch you out on the street, you or your family.' " When viewed as a whole, a reasonable jury could conclude Muhammad's statements and actions conveyed unequivocal, unconditional, immediate, and specific threats. (Cf. *People v. Butler* (2000) 85 Cal.App.4th 745,

754–755 [finding sufficient evidence where defendant called victim a " 'fucking bitch,' " told her to mind her own business or she would get hurt, he and others surrounded her, and he grabbed her arm, conveying intent to use force].)

Muhammad also asserts his statements were merely angry outbursts conveying his frustration that neither he nor Lee could stay at the shelter. Muhammad points out that he told Guzman to "[g]et the fuck up out of here," and said he was not threatening her. He contends this shows he was simply expressing his irritation that the units were empty, and his intent was to "persuade" Guzman to allow homeless people into the units.

It is true that "section 422 does not punish . . . 'mere angry utterances or ranting soliloquies, however violent.' [Citation.]" (*Ryan D.*, *supra*, 100 Cal.App.4th at p. 861.) This is because section 422 " 'was not enacted to punish emotional outbursts, it targets only those who try to instill fear in others.' [Citation.]" (*Ibid.*) However, ordering Guzman to leave the unit, and saying he was not threatening her, does not negate his statements that he also would "cut" or "pop" her, particularly when viewed in the context detailed above which supported a finding that he intended these words as a threat. We do not reweigh the evidence and substitute our judgment for that of the trier of fact. (*People v. Palma* (1995) 40 Cal.App.4th 1559, 1567.) As the Court of Appeal, we resolve all conflicts in the evidence in favor of the judgment. (*People v. Redmond* (1969) 71 Cal.2d 745, 759.)

Muhammad's reliance on *In re Ricky T.* (2001) 87 Cal.App.4th 1132, is misplaced due to the materially different facts of that case. In *Ricky T.*, a 16-year-old student left the classroom to use the restroom. (*Id*. at p. 1135.) The classroom door was locked when he returned. When the teacher opened the

9

door, it swung out and hit the student.  (*Ibid*.)  The student became angry, cursed at the teacher, and said, "I'm going to get you" or "I'm going to kick your ass."  (*Id*. at pp. 1135–1136.)  The Court of Appeal determined the student's statement was made in response to the accident with the door and was "no more than a vague threat of retaliation without prospect of execution" that could not support a conviction for criminal threats.  (*Id*. at p. 1138.)  The court emphasized there was no evidence suggesting that "a physical confrontation was actually imminent."  (*Ibid*.)  The court further reasoned that there was no evidence the student's "angry words were accompanied by any show of physical violence" or evidence that he "exhibited a physical show of force."  (*Ibid*.)

In contrast, Muhammad's statements were not a reflexive reaction to an unanticipated injury or altercation.  They were precipitated by other confrontational and angry behavior aimed at shelter staff.  (*People v. Mendoza* (1997) 59 Cal.App.4th 1333, 1340 [the parties' history can be considered in determining if statements constituted criminal threats].)  Muhammad previously violated shelter rules by, among other things, bringing in weapons and aggressive dogs.  Muhammad had also defied the shelter's demand that he move out, going so far as to bring in his own locksmith to replace the shelter's locks.

Nor were Muhammad's threats to "cut" or "pop" Guzman mere words unaccompanied by any physical show of force.  Muhammad and his dog cornered Guzman in a unit, which he unlocked after she refused to do so.  Muhammad also allowed his dog to approach Guzman through the window, which she had attempted to close.

Substantial evidence permitted the jury to find Muhammad guilty of making criminal threats beyond a reasonable doubt. (*Vargas*, *supra*, 9 Cal.5th at p. 820.)

## III. Substantial Evidence Supports Muhammad's Burglary Conviction

Muhammad also contends his conviction for second degree burglary must be reversed because there was insufficient evidence he intended to threaten Guzman when he entered the unit. Reviewing the evidence in the light most favorable to the judgment, we conclude substantial evidence supports Muhammad's burglary conviction.

Burglary is the entering of a building "with intent to commit . . . any felony." (§ 459.) "Burglary is a specific intent crime. [Citation.] It requires not only that a defendant enter a structure, but that he or she do so with a particular objective in mind . . . ." (*People v. Hendrix* (2022) 13 Cal.5th 933, 939.) "Commonly, that intent must be inferred from the circumstances . . . ." (*People v. Holt* (1997) 15 Cal.4th 619, 669 (*Holt*).) "[B]urglary is seldom established with direct evidence but instead is usually inferred from all the facts and circumstances surrounding the crime." (*People v. Lewis* (2001) 25 Cal.4th 610, 643 (*Lewis*).) "The question here is whether the evidence, including that of defendant's conduct during and after his entry, supports a reasonable inference" of intent to commit the charged offense at the time of entry. (*Holt*, at p. 670.)

The prosecution argued Muhammad committed the burglary not when he entered the shelter facility, but when he went to the unit Guzman was attempting to secure, reached through its open window, and unlocked the door. Muhammad argues the evidence established only that his intent was to obtain

shelter for Lee or other homeless people, not to threaten Guzman. We disagree.

Substantial evidence supports the jury's conclusion that Muhammad entered the unit with the intent to threaten Guzman. It was reasonable for the jury to infer that when Muhammad unlocked the unit, he intended to confront her. Before he unlocked the door, he stood outside the unit, yelling at Guzman and allowing his dog to advance towards her through the window. Still angry, he reached through the window Guzman had attempted to close and unlocked the door, furthering the confrontation. These actions did not appear to advance a singular or exclusive goal of opening the unit for a homeless person, given that Guzman was inside telling him he could not enter.

Moreover, "[e]ven if we were to find that a rational trier of fact could draw from this evidence the inferences [Muhammad] suggests,"— that he was entering the locked unit without any intent to threaten Guzman—"reversal of the judgment would not be warranted." (*Lewis*, *supra*, 25 Cal.4th at p. 643.) Our high court has made clear that "[i]f the circumstances reasonably justify the jury's findings as to each element of the offense [of burglary], the judgment may not be overturned when the circumstances might also reasonably support a contrary finding." (*Id*. at pp. 643–644.) Here, the evidence reasonably justifies the

12

jury's finding that Muhammad entered the unit that Guzman was in to threaten her.  We affirm the burglary conviction.[3]

**DISPOSITION**

The judgment of the trial court is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


ADAMS, J.


We concur:


LAVIN, Acting P. J.


EGERTON, J.

---

[3]    Muhammad also argues that because his convictions were not supported by the evidence, his constitutional rights were violated.  Substantial evidence supported both convictions.  We therefore find there was no violation of Muhammad's constitutional rights.