Filed 6/9/26  P. v. Griffis CA2/4

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>CHRISTOPHER GRIFFIS,<br><br>    Defendant and Appellant. | B341637<br><br>(Los Angeles County<br> Super. Ct. No. BA445708) |

APPEAL from an order of the Superior Court of Los Angeles County, Gustavo N. Sztraicher, Judge.  Affirmed.

Gary V. Crooks, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Charles C. Ragland, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Michael C. Keller and Viet H. Nguyen, Deputy Attorneys General, for Plaintiff and Respondent.

# INTRODUCTION

In 2017, a jury found defendant Christopher Griffis guilty of first degree murder. In 2022, Griffis filed a petition for resentencing under Penal Code section 1172.6.[1] Following an evidentiary hearing, the trial court denied the petition on two grounds, one of which was that defendant was guilty beyond a reasonable doubt as a direct aider and abettor who harbored express malice. On appeal, Griffis contends there was insufficient evidence to support his conviction, the trial court failed to consider his youthfulness at the time of the offense, and the prosecutor committed prejudicial misconduct. We affirm.

# FACTUAL BACKGROUND[2]

I.     *The Killing of Bradford Smith*

The Rolling 20's Bloods and Rolling 30's Harlem Crips were rival gangs in South Los Angeles. Bradford Smith, known as "Baby Slick," was a member of the Rolling 20's. In the early evening of March 14, 2016, during a wave of violence between the two gangs, Smith was shot and killed in front of 1801 West Adams Boulevard. That location was within territory claimed by the Rolling 20's. Later that evening, a large group of people gathered near where Smith was killed to conduct a candlelight vigil. Griffis attended and identified himself as a member of the Rolling 20's to a police officer.

---

[1] All further statutory references are to the Penal Code unless otherwise stated.

[2] The facts are taken from our opinion in Griffis's direct appeal (*People v. Griffis*, B284781) [nonpub. opn.]) and are not disputed by the parties.

II.    *The Killing of Lorenzo Ambrosio*

After the vigil, surveillance showed a white Malibu passing by Sammy's Liquor Store on Jefferson Boulevard at Ninth Avenue three times within a short time.  The liquor store was located in Rolling 30's claimed territory.  First, the Malibu drove west on Jefferson Boulevard and turned north onto Ninth Avenue.  About three minutes later, the Malibu traveled the same route, passing the liquor store again.  After the second drive past the store, the video showed two people in a parking lot running toward, and shooting at, the Malibu.  A few minutes later, the Malibu passed by the store a third time but eastbound and there were "sparks" (apparently muzzle flashes).  A man riding a bicycle outside the store, later identified as Lorenzo Ambrosio, was fatally shot and fell to the ground.  The shooting occurred at approximately 10:43 p.m.

About a month prior to the Ambrosio shooting, Officer Brian Schneider had stopped a white Malibu driven by Kayveon Livingston, in which Griffis and two other men were passengers.  Livingston and Griffis both identified themselves as members of the Rolling 20's.

III.    *The Police Interview*

On June 22, 2016, Griffis and Livingston were arrested for the Ambrosio murder.  They were taken to the police station and placed in the same cell.  Detective Rene Castro and Officer Christopher Courtney interrogated Griffis.  Griffis acknowledged being a Rolling 20's gang member but stated he was no longer frequenting the neighborhood.  Griffis admitted to seeing Livingston around but did not know his name.  He was evasive about his familiarity with Livingston's car.

In the interrogation, Griffis said Smith was like an older brother to him and he was upset about his murder. Griffis stated that he went to the vigil on the evening of Smith's death, but he denied seeing Livingston there. He also said he had not heard about the Ambrosio murder as he spent most of the evening at a girlfriend's home. When the officers stated people had placed him in Livingston's car that night, Griffis denied being in the car. At first, Griffis denied having a cell phone in March 2016, but later admitted he did have one. After further questioning, Griffis told the officers that about a week after Smith was killed, Livingston told him that he had gone to Rolling 30's territory alone and shot someone. Griffis then changed the story, stating that Livingston said there was someone else in the car with him who did the shooting. Griffis further stated that someone in Livingston's car was the shooter and he was in another car "trailing" behind the Malibu. He first said the second car was a gray truck, but later said it was a gray Hyundai, and the driver was an "older homie." The police asked Griffis, "what was the plan?" Griffis stated, "[t]rying to go find something," and that "[w]e was gonna just try to let—just let—let anger out."

The officers told Griffis that he kept changing his story, which led them to believe he was the shooter. Griffis denied that he was the shooter. The interrogation continued:

Officer Courtney: "Then what happened?"

Griffis: "That they went to go shoot. I was in another vehicle."

Officer Courtney: "There wasn't another vehicle."

Griffis: "It was. If you look at that tape, I know there's a gray Hyundai and that vehicle."[3]

---

[3] Officer Courtney subsequently reviewed all the surveillance videos. He did not see a car following the Malibu, did not see any other car appear more

4

Detective Castro: "Okay.  And when you guys left, they were gonna go look for [Rolling] 30's.  Is that what happened?"

Griffis: "That's what that car was doing."

Detective Castro: "But you took off with that car.  You guys took off following that car."

Griffis: "Yeah, but the older homie didn't tell me, because I asked him, 'what's going on?'  He said, 'Just look and watch.'"

Detective Castro: "What did that mean to you?"

Griffis: "Look and watch.  Now, I—I'm thinking, oh, yeah, they finna go shoot something or they finna go do something that they not supposed to."

Detective Castro: "When you got in the car, did you know—in your head without anyone telling—telling you anything, you knew what was gonna happen?"

Griffis: "No.  I knew it start happening when we started going in the area, not just, okay, we at the candlelight.  Everybody get in they cars.  We already know what—what up.  We got a plan.  No."

"Everybody in motion.  People still crying.  Like, it was more so, like, the older homie he, like, that car finna—yeah.  Like they finna do they thing.  They finna do their job.  And we just trailer."

The officers asked Griffis to identify the driver of the trail car and the people in the lead car.  They showed him pictures of several individuals.  Griffis identified some of the participants but said he did not see everyone who got in the lead car.

_____

than once in the videos, and did not see a gray truck or Hyundai.  However, surveillance footage from Oasis Laundromat, which was located next door to Sammy's Liquor Store, depicted a gray car following a white Malibu just prior to the shooting.

5

The officers took a break.  When they returned, Officer Castro said they were puzzled about some of the missing details.  He told Griffis they were leaning towards the conclusion Griffis was leaving out details because he was the shooter.  Griffis said he was not the shooter.  Griffis later identified Tiny M as the shooter and said Tiny M was riding in the Malibu with an "AK."  Griffis also said he met with some others at a laundromat on the night of the vigil.  When asked how he knew Tiny M was the shooter, Griffis said Tiny M was the last person who had the AK and "the only one talking about it."  Griffis said when he saw Tiny M walking to the car "he had [the AK] in his pants."

IV.  *The Jail Conversation*

After interrogating both Griffis and Livingston, the police placed them back together in the same jail cell with a hidden recording device.

Griffis said, "Police know your car.  And they trying to catch us for that hot one."  Livingston said, "You didn't say nothing, right?"  Griffis assured Livingston he said nothing.  Griffis said the police were talking about "the phone" and "our phones" showing the two men at the same location.  Griffis said, "How the [f***] is our phones in the same location, fool?"  He stated, "And then they said that our phone[s] w[ere] in the area.  How is that possible?  Yeah, we left it at DM house.  That day."  The conversation continued:

Griffis: "Man, that [sh*t] coming—my [sh*t] online, fool.  Remember all them the phone calls, yeah, this bitch is like, 'The shats in here.' "

Livingston: "Man, it was supposed to be the airplane mode, shats."

Griffis: "Those calls—"

Livingston: "The shats was supposed to be off.  The shats was off."

Griffis: "It was on. Remember?"

Livingston: "Whatever they got, they got it, bro."

Griffis: "Uh-huh."

Livingston: "Just don't give them nothing else. That's it."

Livingston said, "I wasn't there. I wasn't driving. The car, I guess, was there. They saying it was, but, [sh*t], I don't remember. I wasn't there. I wasn't driving." He said, "Just because it's my car, don't mean I'm in the [mother*****]."

Griffis said the police had seen his Facebook records.


V.    *The Cell Phone Evidence*

Cell phone records indicated that on March 14, 2016, from 8:59 p.m. to 9:15 p.m., Livingston's cell phone moved from west to east toward the area of 1801 West Adams Boulevard, the location of the Smith shooting. From 9:34 p.m. to 9:55 p.m. the phone moved south from that area, and then west towards the area of Jefferson Boulevard and Ninth Avenue, the location of the Ambrosio shooting. From 10:01 p.m. to 10:29 p.m., the phone moved back east toward the area of 1801 West Adams Boulevard. From 10:32 p.m. to 10:40 p.m., Livingston's phone was in the general vicinity of 1801 West Adams Boulevard. At 10:47 p.m. and 10:55 p.m., the phone connected with cell phone towers in the general vicinity of 1801 West Adams Boulevard.

Cell phone records for Griffis's cell phone showed activity from 9:20 p.m. to 9:23 p.m. on March 14, 2016, indicating the phone was in the general vicinity of 1801 West Adams Boulevard. From 9:21 p.m. until 10:55 p.m. that evening, the phone did not connect with any cell tower in the area, indicating the phone was either turned off, in airplane mode, or in an area with no cell tower coverage.

7

According to the cell phone records, at 10:55 p.m. that evening both Griffis's and Livingston's cell phones connected with cell towers in the 1801 West Adams Boulevard area, indicating both phones were in the area at that time.

VI.    *The Gang and Social Media Evidence*

A gang expert testified that the Rolling 20's Bloods and Rolling 30's Harlem Crips are rival gangs in adjacent neighborhoods, with Jefferson Boulevard forming a boundary between the two gangs. At the time of the Smith and Ambrosio murders in March 2016, the number of shootings of gang members was particularly high. In such an environment, when a gang member is shot his fellow gang members assume the shooting was committed by the rival gang. The expert further testified that to mislead law enforcement and witnesses gang members often use a "trail" car to attract attention away from the car carrying the shooter. By riding in a trail car, a gang member can assist in the commission of a crime and enhance his status within the gang.

The prosecution presented records from a Facebook account under the name "Gt da Mess." Griffis had acknowledged in his police interview that he had a Facebook account under that name. "RTB.I.P baby Slick" appeared on the Facebook account, which the gang expert interpreted to mean "Rolling 20 Blood in peace" and a reference to Smith, as a tribute to a fallen gang member. Under that language there were several emojis depicting a crying face, hands praying, thumbs down, and a gun. Records from Griffis's Facebook account included messages between him and a Kyra Pearson. Referring to Smith's death, Pearson stated shortly after midnight on March 15, 2016, "Yeah, this shit ain't no joke? I'm really finna cry." Griffis

8

responded, "Man to[o] late for that. we did that. we going back. we already went for bl[oo]d." A status update posted on the account shortly after midnight stated, "Body for body."

## PROCEDURAL BACKGROUND

### I. *Conviction and Sentence*

A jury convicted Griffis of first degree murder of Lorenzo Ambrosio (§ 187, subd. (a)) and shooting at an occupied building (§ 246).[4] The jury found true the gang and firearm enhancements (§§ 186.22, subd. (b)(1)(C), (b)(4), 12022.53, subds. (d), (e)(1)). The trial court sentenced Griffis to 50 years to life in state prison.

On appeal, this court remanded the matter to allow the trial court to decide whether to strike the firearm enhancements but otherwise affirmed the judgment. On remand, the trial court struck the firearm enhancements and Griffis was resentenced to 25 years to life in state prison.

### II. *Petition for Resentencing*

In 2022, Griffis filed, in pro. per., a section 1172.6 resentencing petition. Griffis was appointed counsel. The trial court found Griffis had made a prima facie case for relief and issued an order to show cause. Following an evidentiary hearing, the trial court denied the petition, finding that Griffis was guilty beyond a reasonable doubt of murder under the current law on two theories: (1) he was an aider and abettor who acted with express malice; and (2) he was a conspirator to the murder.

Griffis timely appealed.

---

[4] Griffis and Livingston were tried together before separate juries.

9

## DISCUSSION

### I.     *Overview of Sentencing Procedure*

In 2018, the Legislature enacted Senate Bill No. 1437, effective January 1, 2019, "'to amend the felony murder rule and the natural and probable consequences doctrine, as it relates to murder, to ensure that murder liability is not imposed on a person who is not the actual killer, did not act with the intent to kill, or was not a major participant in the underlying felony who acted with reckless indifference to human life.'" (Stats. 2018, ch. 1015, § 1, subd. (f).)  In addition to amending the Penal Code, Senate Bill No. 1437 added section 1170.95 (now 1172.6), "which provides a procedure for convicted murderers who could not be convicted under the law as amended to retroactively seek relief." (*People v. Lewis* (2021) 11 Cal.5th 952, 959.)

Upon the filing of a facially sufficient resentencing petition, the superior court must conduct a prima facie analysis to determine the petitioner's eligibility for relief, and, if the requisite prima facie showing is made, issue an order to show cause.  (§ 1172.6, subd. (c); *People v. Wilson* (2023) 14 Cal.5th 839, 869 (*Wilson*); *People v. Nieber* (2022) 82 Cal.App.5th 458, 469–470.)  At the evidentiary hearing following issuance of an order to show cause, the superior court acts as an independent fact finder, and the prosecution bears the burden of proving beyond a reasonable doubt that the petitioner is guilty of murder under current California law.  (§ 1172.6, subd. (d)(3); *Wilson, supra*, at p. 869.)

### II.     *Standard of Review*

"On appeal from the denial of a section 1172.6 petition after an evidentiary hearing, we review the superior court's factual findings for

10

substantial evidence and the court's application of the law to those facts de novo. (*People v. Wilson* (2023) 90 Cal.App.5th 903, 916.) In conducting our review, we consider the whole record in the light most favorable to the superior court's findings (*People v. Rivera* (2019) 7 Cal.5th 306, 323), and we presume "'every fact in support of the judgment the trier of fact could have reasonably deduced from the evidence.'" (*Id*. at p. 331.) We ask 'whether substantial evidence, defined as reasonable and credible evidence of solid value, has been disclosed, permitting the trier of fact to find guilt beyond a reasonable doubt.' (*People v. Vargas* (2020) 9 Cal.5th 793, 820.) And based on this whole record review, we "'determine whether *any* rational trier of fact could have found the essential elements of the crime . . . beyond a reasonable doubt.'" (*People v. Montanez* (2023) 91 Cal.App.5th 245, 270.) Finally, our Supreme Court has held that whether the prosecutor relied upon direct or circumstantial evidence, if the trier of fact's determination is supported, reversal is not warranted, even where ""the circumstances might also reasonably be reconciled with a contrary finding."" (*Vargas,* at p. 820, quoting *Rivera,* at p. 331.)" (*People v. Hill* (2024) 100 Cal.App.5th 1055, 1066.)

III.    *Analysis*

Griffis contends there was insufficient evidence to support his murder conviction under the current law. We disagree.

The trial court found that defendant was guilty of murder as a direct aider and abettor who acted with express malice. Murder is "the unlawful killing of a human being . . . with malice aforethought." (§ 187, subd. (a).) Malice may be express or implied. (§ 188.) Express malice is "the intent to kill." (*People v. Gonzalez* (2018) 5 Cal.5th 186, 192.)

11

To establish a defendant aided and abetted the crime of murder, there must be sufficient evidence he or she, "(i) with knowledge of the unlawful purpose of the perpetrator, (ii) and with the intent or purpose of committing, facilitating or encouraging commission of the crime, (iii) by act or advice, aid[ed], promote[d], encourage[d] or instigate[d] the commission of the crime." (*People v. Cooper* (1991) 53 Cal.3d 1158, 1164.) Contrary to Griffis's assertion, aiding and abetting may be shown by circumstantial evidence. (*People v. Garcia* (2008) 168 Cal.App.4th 261, 273.) Factors to consider when determining whether a person aided and abetted include presence at the scene of the crime, companionship, and conduct before and after the offense. (*People v. Campbell* (1994) 25 Cal.App.4th 402, 409.)

Here, Griffis points out what evidence is not in the record, such as direct evidence linking him to the murder. He also draws inferences from the available facts contrary to those supporting the trial court's decision and concludes the evidence was insufficient to prove he shared the perpetrator's intent to kill. However, a defendant "does not show the evidence is insufficient by citing only his own evidence, or by arguing about what evidence is *not* in the record, or by portraying the evidence that is in the record in the light most favorable to himself." (*People v. Sanghera* (2006) 139 Cal.App.4th 1567, 1573; see also *People v. Cuevas* (1995) 12 Cal.4th 252, 261 ["The focus of the substantial evidence test is on the *whole* record of evidence presented to the trier of fact, rather than on ' "isolated bits of evidence" ' "].) Reviewing the evidence in the light most favorable to the court's determination, there is substantial evidence to support the court's reasonable

12

inferences that Griffis shared the perpetrator's intent to kill and that he aided and abetted the murder.[5]

There was evidence Griffis knew his fellow gang members intended to commit the revenge killing and shared in the intent to kill. Griffis was present at the laundromat with his fellow gang members when they decided to go into Rolling 30's territory to seek revenge. They planned to find "something" to "let [their] anger out" over Smith's death. Griffis knew that Tiny M left the laundromat armed with an AK-47 and believed him to be the shooter because he was "the only one talking about it." He acknowledged the lead car was going to look for Rolling 30's members and understood that meant "they finna go shoot something or they finna go do something that they not supposed to." Griffis helped facilitate the killing by stationing himself in the "trail" car with an older gang member. As opined by the gang expert, the trail car was used to divert attention away from the car with the shooter in addition to assisting his fellow gang members in carrying out the crime.

Griffis had a strong motive to aid and abet in the murder, which was to avenge the murder of his close friend and fellow gang member who was like a brother to him. Given the escalating territorial battle at the time, aiding in a retaliatory murder would also raise Griffis's status in the gang. (*People v. Hernandez* (2004) 33 Cal.4th 1040, 1049 [evidence of gang affiliation is relevant to motive or intent].) Griffis's social media posts on Facebook shortly after the murder further demonstrated that he was an active participant in the killing and shared the perpetrator's intent to kill. For example, he posted "Body for body" and a tribute to Smith with a gun emoji,

_____

[5] Because we conclude there was substantial evidence of express malice, we do not address the trial court's alternative grounds.

13

which all suggested the killing was an act of revenge. The statement "we already went for bl[oo]d" in another post shortly after the murder also tends to show Griffis's knowledge and participation. Furthermore, Griffis's contradicting and false statements to police showed his consciousness of guilt. (*People v. Hughes* (2002) 27 Cal.4th 287, 335.) When interrogated by police, Griffis provided misleading and false statements to evade his responsibility in the murder. These statements included that he did not know Livingston, he was visiting his girlfriend at the time of the murder, he did not own a cell phone in March 2016, and that Livingston said he committed the shooting himself.

Griffis contends that the trial court should have considered his youth at the time of the offense in determining whether he had the requisite mental state. We note that the record reflects that the trial court did in fact consider his youth, at length, but ultimately did not find it a "decisive factor when determining whether the defendant possessed the requisite mental state for first degree murder." More importantly, the recent appellate authorities to which Griffis points discuss the relevance of a defendant's youth in section 1172.6 proceedings only with respect to whether the defendant acted with (1) reckless indifference to human life, or (2) implied malice (i.e., with disregard for life and with knowledge that the conduct endangers the life of another). (See *People v. Pittman* (2023) 96 Cal.App.5th 400, and *People v. Jiminez* (2024) 103 Cal.App.5th 994.) These cases reason that a trial court should consider a defendant's youthfulness in determining whether the defendant harbored one of the aforementioned mental states because, "youth is relevant to a criminal defendant's ability to perceive [the] risk[s] and consequences" of his or her conduct. (*Pittman, supra*, 96 Cal.App.5th at p. 417; see *Jimenez, supra*, 103 Cal.App.5th at pp. 1003–1004.)

14

Here, the trial court found Griffis acted with express malice (i.e., the intent to kill).  Because a defendant who acts with express malice intends that his or her conduct result in death, a finding of express malice does not implicate concerns about a youthful defendant's perception of risk.  Griffis fails to cite any authority requiring a court to consider youth when determining whether a defendant acted with express malice.  In the absence of such authority, we decline to do so here.[6]

Accordingly, we conclude there was substantial evidence to support the trial court's finding that Griffis was guilty of murder as a direct aider and abettor who acted with express malice.

## DISPOSITION

We affirm the trial court's order denying Griffis's section 1172.6 petition.

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

ZUKIN, P. J.

WE CONCUR:

MORI, J.                              TAMZARIAN, J.

---

[6] Because youth is not a relevant factor here, we reject Griffis's arguments that (1) it was prosecutorial misconduct for the district attorney to "disrupt" the evidentiary hearing by asserting youth was not a relevant factor; and (2) the trial court failed to properly "deal" with this disruption.

15